Joseph **BELL**, Sophie Karp, Hyman M. Oberman, Lena Smith, the Rainier Company, Inc., a dissolved corporation

v.

The **UNITED STATES**.

No. 384–65.

United States Court of Claims.

Dec. 13, 1968.

Alexander Boskoff, Washington, D. C., attorney of record, for plaintiffs.

Edward M. Jerum, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant, Edward Weintraub, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM: *

Plaintiffs [1] seek review of a decision by the Armed Services Board of Contract Appeals, ASBCA No. 3565, in which the appeal of The Rainier Company, Inc. (Rainier) from an adverse decision by the contracting officer was denied. They allege that the Board's decision was arbitrary, capricious, and unsupported by substantial evidence and contend that they are entitled to either damages or an equitable adjustment in the sum of $115,-900.22 under a contract between Rainier and defendant, acting through the Ordnance Corps, Department of the Army.

The contract, dated March 20, 1953, called for the manufacture of 62,552 bomb parachutes at a price of $67.628 per unit or a total contract price of $4,230,-266.60.[2] By a contract modification, the original delivery schedule was changed to provide for delivery of a pilot lot of parachutes in October 1953, and for monthly deliveries beginning in February 1954, at the rate of 5,500 units per month until anticipated completion in January 1955. Article 37 of the contract contained a so-called "broad form" of "Changes" clause of the type published in paragraph 7–103.2d of the Army Procurement Procedure, which read in pertinent part as follows:

The Contracting Officer may at any time, by a written order, and without notice to the sureties make changes of any one or more of the following types:—(a) changes in the directions as to shipment and packing of any supplies; (b) increases or decreases in the quantity of supplies to be furnished hereunder, the total increases, in the aggregate, in the quantity of said supplies not, however, to exceed 62,552 and the total decreases, in the aggregate, in the quantity of said supplies not, however, to exceed 6,255; (c) changes in the drawings or specifications, where the supplies to be furnished are to be specially manufactured in accordance with the drawings and specification; (d) extensions of the delivery schedules hereunder reducing the rate of deliveries of the supplies called for by this contract; or (e) accelerations of the delivery schedules hereunder by an increase or increases in the rate of deliveries hereunder. Unless consented to in writing by the Contractor, no change orders hereunder of the type mentioned in clause (d) of the preceding sentence shall cause decreases in the deliveries hereunder, and no change orders of the type mentioned in clause (e) of such sentence

* This opinion incorporates the opinion prepared by Commissioner Lloyd Fletcher, with some changes and additions. In respect to supervisory salaries, the court reaches a different result from the commissioner's.

1. The individual plaintiffs are either shareholders and principal officers, or the sole beneficiaries of the estates of deceased shareholders and principal officers of plaintiff, The Rainier Company, Inc., a dissolved corporation.

2. As a result of various changes and modifications, the contract price was later increased to $4,265,041.21.

shall cause increases in the deliveries called for hereunder, amounting respectively in the aggregate in any one month to more than 550 (Decrease) and/or 5,500 (Increase) the delivery of which is called for by this contract. If such changes cause an increase or decrease in the amount of work under this contract or in the cost of performance of this contract or in the time required for its performance an equitable adjustment shall be made
*   *   *

The parachute (known as Parachute-Unit M6 with Arming Wire Assembly for Anti-Ricochet Device) was to be manufactured in accordance with military specifications BP-P–1607 which were incorporated into the contract. The design and specifications for the M-6 parachute had been developed by Ordnance Ammunition Command, Joliet, Illinois. It was intended to be attached to a 500-pound bomb which could be dropped from an aircraft flying at low altitude, and the purpose of the parachute was to cause the bomb to come to rest within 750 feet from the aircraft's slipstream to final halt. No deviation from the specifications and drawings was permitted except by authority of the contracting officer.

All Rainier's parachutes were inspected by Army inspectors during manufacture, and all satisfactorily complied with the contract specifications and drawings. After completion, however, it was required that they be subjected to ballistic tests conducted by Aberdeen Proving Ground, Maryland. Rainier tendered 59 lots for ballistic testing, varying in size from less than 600 to as high as 1500 units. From each lot, six parachutes were selected for testing at Aberdeen. If the test sample passed, the entire lot was accepted; if it failed, a retest was made using new samples from the lot which may or may not have been reworked. Pertinent contract provisions with respect to these ballistic test procedures follow:

b. *Investigation of failures.* Whenever the rejection of complete rounds or loaded components, containing parts or materials supplied to the contractor by the Government is based upon the failure to meet the requirements of a proving ground test, the Government shall investigate with a view to determining the cause of failure. If such an investigation discloses that the contractor is responsible for the failure, he shall remedy the condition at his own expense, and after so doing, the test in the phase or phases under which the failure occurred shall be repeated. If this investigation does not disclose that the contractor is responsible for the failures, the material shall be accepted for payment and disposition of the lot shall be determined by the .Chief of Ordnance.
*   *   *   *   *   *

E–5a. Not more than one parachute shall fail to limit the travel of the bomb, from slipstream to final rest, as follows:
*   *   *   *   *   *
M6, 750 feet maximum
*   *   *   *   *   *

F–6b. *M6 units.* Assemble 6 units to inert loaded 500-pounds G.P. bombs equipped with inert fuzes. Insert the arming wires through the latches and vane shaft. Release the bombs individually, for impact on normal soil, from a plane flying at a calibrated indicated air speed of 350 miles per hour in level flight and at an altitude of approximately 100 feet. Observe to determine if the fuze arms.

F–6c. *Retest.* A retest, using the same number of samples used in the original test will be permitted if requested by the contractor provided not more than 2 units fail to meet the requirements of paragraph E–5a.

Rainier's first lot was tested and rejected on January 4, 1954. After Rainier had reworked the lot, it was retested on January 19, and was accepted. The next eight lots were accepted on their first tests. The tenth lot was tested and rejected on March 18, but the following day was retested and accepted.

There were no more test failures until the fifteenth lot which failed its test on April 15, and 5 days later again failed on retest. The seventeenth and eighteenth lots were rejected April 30 and May 4, respectively, and failed their retests on May 4. Rainier's officers were very concerned about the rejection of these three lots that had failed on retesting which comprised 3075 parachutes and represented more than $200,000 for which Rainier could not be paid. They feared that future lots might also fail the ballistic tests and be rejected. To them, the ballistic tests were unfair because admittedly Rainier was manufacturing the parachutes strictly in accordance with the specifications and drawings, yet some lots were failing the tests, and no one in the New York Ordnance District (which was administering the contract) was able to tell them the reason for the failures. However, the contracting officer took the position that there was nothing he could do about Rainer's unfortunate situation because, in his view, the ballistic tests were required by the contract, and he could not waive them without specific approval of the Ordnance Ammunition Command at Joliet (hereinafter sometimes called "Joliet").

Thereupon, plaintiff, Joseph Bell, who was Rainier's treasurer and in overall charge of its operations under this contract, decided there was only one thing to do. On May 5, 1954, he went to Joliet, in his own words, "screaming for relief." Specifically, he requested discontinuance of the ballistic testing as a prerequisite for acceptance of parachutes, a corrective specification which would obtain the desired testing result, and payment for the three rejected lots. According to Bell's testimony, a lieutenant at Ordnance Ammunition Command replied by suggesting that he "take it easy, mark time, and we will find the answer for you."

At the instance of the Office of the Chief of Ordnance, a meeting to consider the test failure problem was held at Aberdeen Proving Ground on May 27 and 28, 1954. Representatives from Rainier and the two other contractors then manufacturing the same parachute (Sigmund Eisner and Security Parachute Company) were present. A memorandum written by a Government engineer, who was also present, indicated that the parachutes manufactured by Rainier and Eisner were sluggish in opening and did not inflate fully, with the result that such parachutes did not bring their bombs to rest in as short a distance as required. The percentage of failures for the respective contractors was as follows: 33.89 percent for Rainier; 20 percent for Eisner; and 6.25 percent for Security.

Only Rainier had at that time experienced rejection of any of its lots, although Eisner's lots were considered borderline. Ninety-one percent of Rainier's parachutes stopped within a distance of 789 feet, the contract requirement being 750 feet. It was concluded that the better performance shown by Security's parachutes was attributable to deviations from the specifications developed by Security. As a result of the meeting, the other contractors were instructed to follow Security's deviations. Finally, after some experimental changes had been ordered for a limited number of parachutes, Change Order No. 41 was issued on September 3, 1954, which was expected to eliminate test failures for all subsequently produced parachutes, and for which a price adjustment was later agreed upon. Although this change improved test results, it did not entirely solve the problem of test failure.

With respect to the three lots of 3075 parachutes that had failed retesting and had been rejected, plaintiff was eventually paid the full price upon the Government's acceptance of those parachutes on June 10, 1954. Further, pursuant to authorization from Ordnance Ammunition Command, the contracting officer issued Change Order No. 37 under date of June 22, 1954, which provided for future acceptance of lots even though failing the ballistic test if

there was no evidence explaining the failure. Following is the text of the change order:

Applicable ballistic requirements for acceptance of contract item have been modified insofar as the judging of lots rejected for not meeting the 750 feet maximum requirement on an individual basis.

If the failing units show no evidence explaining the failure, such as cut shroud lines, etc., the lot may be accepted.

This modification will only apply until the parachute design has been corrected.

This change order was accepted by Rainier and, according to Bell's testimony, Rainier was thereby relieved of its anxiety over the prior test failures and its uncertainty as to the Government's position. However, Change Order No. 40 was issued by the contracting officer on August 11, and modified the above-quoted Change Order No. 37, by deleting the words "may be accepted" and substituting the words "shall be given consideration toward acceptance on a waiver basis." Rainier never agreed to this revision and proceeded without regard to it.

Rainier was not required by the contract to maintain production figures. However, an attempt to construct such figures was made from other available data, such as the delivery schedules. From this data it was determined that the highest production month was July 1954. Production had been substantially less during the preceding two months when measured in terms of units completed. However, during that time, Rainier's employees were performing piecework operations and none were laid off. Their salaries and wages continued to be much the same as they had been before.[3] The explanation for the decline in the number of parachutes completed, but without any substantial decline in the dollar amount of piecework labor operations, appears to be that Rainier had rearranged its production line during May and June with the result that many chutes were partially fabricated but fewer were completed. This was done in anticipation that a correction of the design specification would be forthcoming from Joliet with respect to what was considered the critical portion of the chute causing the numerous test failures. The large amount of completions in July was partially attributable to the production line rearrangements of May and June during which time many parachutes were being partially fabricated but were not finally completed until July. After Change Order No. 37 was issued in late June, providing for expeditious acceptance of failing lots, Rainier resumed full production, and its output of completed chutes increased substantially.

Rainer at no time discontinued production entirely. After lots 15, 17 and 18 were rejected in April and early May, as described above, lots continued to be submitted for testing at intervals of approximately one week. Eight lots passed the ballistic tests. Lots 27 and 28 failed their initial tests but were accepted on retest. During the period July 20 through September 8, seven of ten lots failed ballistic tests but were accepted on waiver. Thereafter, four of twenty lots failed but were accepted on waiver. The number of days which elapsed between initial testing and acceptance for all lots failing the test varied from as few as two days to as many as 56. Between Change Order No. 37 (June 22) and No. 41 (September 3), the latter of which was intended to correct the design defects, eight lots failed the ballistic tests with the result that their acceptances were delayed an average of three weeks. Of the 59 lots

---

3. A wage increase retroactive to these months was negotiated in June 1954.

produced under the contract, all were accepted, as follows:

41 after initial test;
3 after retest;
1 after rework and retest;
14 upon waiver.

In its claim for an equitable price adjustment pursuant to the "Changes" article of the contract, Rainier contended before the ASBCA that the test failure problem had caused a deceleration in production and scheduled deliveries all of which increased Rainier's cost of performance. The alleged deceleration order, plaintiff argued, should be inferred from two things: (a) the advice given by the unidentified lieutenant at Joliet to "take it easy, mark time, and we will find the answer for you;" and (b) the waiver procedure by which parachutes failing the ballistic test would be rejected and later accepted upon waiver of the requirement. With respect to the former, Bell testified that he interpreted this remark as a request for a production slowdown or delivery deceleration pending correction of the faulty design. To the ASBCA, however, the contractor's conduct was inconsistent with its interpretation because, thought the Board, in such circumstances it would be expected that a reasonable contractor would have asked for written confirmation before relying upon the lieutenant's statement. By inference, too, from the Board's remarks to the effect that New York Ordnance District continued to administer the contract, the ASBCA apparently considered that the lieutenant was not authorized to order deceleration.

Concerning the waiver procedure and defendant's insistence that the test requirement be fulfilled the ASBCA found "no evidence of dalliance or lack of diligence" in Joliet's efforts to correct the design and grant relief to plaintiff. Specifically, the Board decided there was no evidence that the Government "took an unreasonable time to evaluate test failure results and accept parachutes on a waiver basis, and * *

delayed any acceptances to induce the contractor to slow down production." Finally, discussing a related contention that Joliet delayed an unreasonable period before authorizing the issuance of a corrective specification, the Board held that, even assuming there was an unreasonable delay, "this did not slow down or disrupt * * * production, as appellant did not wait for the change order before resuming full scale production."

However, the Board did find that Rainier, "as a result of the circumstances of the ballistic test failure problem, * * * experienced a slowdown or disruption of production for about seven weeks, which delayed the completion and delivery of some parachutes."

With respect to this finding, the Board observed:

However, a distinction must be made between acts and conduct of the Government constituting a *de facto* order to decelerate deliveries within the purview of the broad form "Changes" clause and acts and conduct of the Government constituting an excusable cause of delay under the "Default" clause. The former gives rise to a right to both a price adjustment and a time extension under the "Changes" clause; the latter is an excusable cause for delay in deliveries under the "Default" clause, but does not give rise to a price adjustment. Appellant points out that, as a result of the test failure problem, it fell behind in deliveries under the revised delivery schedule although it ultimately caught up and completed on schedule. We have no doubt that the test failure problem was an excusable cause of delay in deliveries, but it cannot be found to involve a deceleration order under the broad form "Changes" clause entitling the contractor to a price adjustment.

However accurate the foregoing distinction may be as an abstract proposition, the Board has erroneously applied it to this case as a matter of law. There

appears to be no dispute that the failure of some of Rainier's parachutes to meet the ballistic test was not due to Rainier's fault. That Rainier's troubles were not of its own making is highlighted by the fact that ultimately the Government accepted and paid for all of Rainier's chutes whether or not they had failed the ballistic test. The fault lay in the Government's defective design for the M–6 parachute, and, if Rainier suffered additional costs in trying to comply with the defective specifications, this court has said it is entitled to recover. Hol-Gar Mfg. Corp. v. United States, 175 Ct.Cl. 518, 524, 360 F.2d 634, 638 (1966):

> The Armed Services Board of Contract Appeals has recognized the correctness of the allowance of costs incident to an attempt to comply with defective specifications. See e. g., J. W. Hurst & Son Awnings, Inc., 59–1 BCA ¶2095 at 8965 (1959), where the Board stated:
>
> > * * * Where, as here, the change is necessitated by defective specifications and drawings, the equitable adjustment to which a contractor is entitled must, if it is to be equitable, i. e., fair and just, include the costs which it incurred in attempting to perform in accordance with the defective specifications and drawings. Under these circumstances the equitable adjustment may not be limited to costs incurred subsequent to the issuance of the change orders. [Citations omitted.]
>
> We hold that the plaintiff is entitled to an equitable adjustment which will compensate it for the costs which it incurred in trying to perform in accordance with the original specifications that turned out to be defective.

See, also Red Circle Corp. v. United States, 185 Ct.Cl. 1, 398 F.2d 836, 841–842 (July 1968), and other cases cited.

The Board found as a fact that the test failure problem resulted in a slowdown or disruption of Rainier's production for some seven weeks during May and June of 1954. Upon making this finding, the Board should have applied its own "constructive change" doctrine by treating as done that which should have been done, namely, the issuance by the contracting officer of a deceleration order pending correction of the Government's faulty design. See Cuneo and Anthony, Beyond Bianchi: The Impact of Utah and Grace on Judicial Review of Contract Appeals Boards' Decisions, 55 Geo.L.J. 602, 612 (1967); and Spector, An Analysis of the Standard "Changes" Clause, 25 Fed.B.J. 177, 179–83 (1965).[4]

That the Board should have considered a constructive deceleration to have arisen out of the test failure problem is by no means the end of plaintiffs' problems in this case, however. The Board found as follows:

> Another defect in appellant's claim is that it has been unable to establish by satisfactory proof that it experienced any increased labor costs as a result of the slowdown and disruption of production brought on by the test failure problem. While it is reasonable to suppose that appellant's rearrangement of its production line did entail some loss of labor efficiency, the evidence adduced by appellant does not establish any increased labor costs. * * *
>
> Aside from the fact that appellant has failed to establish a deceleration order under the "Changes" clause, appellant has not established by satisfactory proof that it incurred the amount claimed for additional supervisory salaries as a result of the test failure problem or any slowdown incident thereto. While the amount

---

4. Before the commissioner, defendant contended that no change had occurred, but before the judges defendant has accepted the commissioner's conclusion (now adopted by the court) that there was a change within the "Changes" article.

claimed for travel and incidental expenses was incurred as a result of the test failure problem, this item of the claim must be disallowed, because we hold that it does not represent increased cost compensable under the "Changes" clause. In view of our holding that the alleged rejections and delayed acceptances did not constitute a deceleration order under the "Changes" clause, the claim for increased interest expense must also be disallowed.

█ In dealing with the evidence relating to excess costs, if any, attributable to the slowdown, the Board's analysis treats with questions of fact. Its findings with regard thereto are binding on the court unless subject to the defects described by the Wunderlich Act, 41 U.S.C. § 321 (1964). Morrison-Knudsen Co., Inc. v. United States, 170 Ct.Cl. 757, 762–764, 345 F.2d 833, 836–837 (1965). The Board has found that Rainier failed to prove any increased labor cost or additional supervisory salaries incurred by it as a result of the May-June slowdown. This conclusory finding stemmed (for the labor costs) from a series of computations made by the Board using figures and other data contained in its record. With respect to the labor costs, the court, if the matter were before it *de novo*, might possibly have arrived at a somewhat different result, especially since, as inferred by the Board, Rainier's rearrangement of its production line during the slowdown period entailed "some loss of labor efficiency." However, in its review of an agency decision, the court's "imprimatur is one of reasonableness, not rightness." Confederated Tribes of the Warm Springs Reservation v. United States, 177 Ct.Cl. 184, 207 (1966). See, also, T. C. Bateson Constr. Co. v. United States, 149 Ct.Cl. 514, 518 (1960) and River Constr. Corp. v. United States, 159 Ct.Cl. 254, 261 (1962). In our judgment, the Board's conclusory finding as to the labor costs was based on

substantial evidence and reflects a reasonable approach (not tainted by any error of law) to the problem of whether Rainier suffered any increased costs for wages attributable to the slowdown. That finding is, therefore, final and conclusive under the first section of the Wunderlich Act, supra.[5]

█ We reach a different result as to the supervisory salaries. The Board admitted, and the Government now concedes, that, upon a holding of a constructive change, Rainier would be entitled to recover for the travel expenses of its officers incurred in connection with the testing problem. This travel entailed trips to Aberdeen for 18 ballistic tests during the period from May through November, and 11 visits to Joliet. Although this considerable amount of travel shows, in and of itself, that supervisory officers were spending time as a result of the testing difficulties, the Board refused to allow anything at all for this item. It rejected the contractor's uncontroverted evidence that its officers were working exclusively, during the relevant period, on the parachute contract (which was being wholly performed at a plant in Lawrence, Mass.) and that the difficulties over the testing placed such demands on the officers' time that they were unable to bid on any work for the company's separate Brooklyn plant, which had previously been quite busy on other projects. The first reason the Board gives for finding this uncontradicted evidence "not convincing" is that the Brooklyn plant became idle about the time when the test problem began and this idleness must have been entirely unrelated to the Lawrence difficulties because the contractor would have obtained orders several months in advance in order to prevent its Brooklyn plant becoming idle in May. The clear error we see in this point is that in the absence of evidence to the contrary—and there is none—the

---

5. The Board's adverse findings as to 72 parachutes for which plaintiffs say Rainier was never paid are also supported by substantial evidence and therefore invulnerable to attack by plaintiffs.

only reasonable inference from the facts is that the contractor's officers would have used the extra time they were forced to spend on the ballistic problem at Lawrence, Aberdeen, and Joliet in beating the bushes for new orders for the Brooklyn factory. That is what businessmen with a non-working plant normally do, but in this instance Rainier's officers could not do so because their time (at least in substantial part) was taken up by the prolonged testing difficulties on the parachute contract and the consequent slowdown. The next reason stated by the Board is that the president and vice-president were "outside men" having nothing to do with production, and there is no evidence of *specific* work by them on ballistic tests. But ordinary human experience tells us, loud and clear, that management officials of a small corporation would normally concern themselves, at least for a good part of their time, with a serious snag in the only contract their company then had, a snag which threatened the company's financial life and its viability. We know as an undisputed fact that all the officers spent their working time on this parachute project, Monday through Friday, traveling to Lawrence each week. In the absence of contrary evidence—and here again there is none—the only reasonable assumption is that at least a substantial part of this time was devoted to the problem which was plaguing Rainier; it is unreasonable to assume that the president and vice-president were sitting idle at the Lawrence plant and doing nothing (by way of planning, inquiry, consultation, contacting the procurement agency, oversight, etc.) to remedy the test problem and to re-set production according to the new schedules. The Board's adverse conclusion was arbitrary and unsupported by any substantial evidence.

As for the other two officers who admittedly worked exclusively on the parachute contract at the pertinent times, the Board rejected any allowance for their salaries because "it does not appear that this was due *solely* to the ballistic test problem. It is unreasonable to believe that the ballistic test problem required *seven months* more of their time than would have otherwise been necessary" (emphasis added). This conclusion rejects the claim simply because Rainier demanded all of the salaries for the whole period, without considering whether part of the contractor's demand should properly have been met. The Board may be correct that the entire claim of $50,148 is unallowable, but we think it was arbitrary in failing to consider what portion of the four officers' compensation is reasonably allocable to the constructive change. Failure to prove the whole of the claimed amount should not bar recovery of lesser sums properly attributable to the change.[6]

In making this determination, the Board may wish to decide on the basis of the present record or, if it feels no appropriate allocation can be made on that basis, may take new evidence. The guidelines should be (a) our holding in this opinion that a reasonable (but undetermined) portion of each officer's salary was necessarily assignable to the change; (b) the general rule that, where (as here) the fact of damage is proved, tribunals are not over-strict in demanding specific proof of exact amounts; and (c) the rule that, in the absence of better methods, so-called "jury verdicts" are allowable where the tribunal can make a fair and reasonable approximation. See WRB Corp. v. United States, 183 Ct.Cl. 409, 425 (1968).

The next items are travel and interest expenses. It will be recalled that, but for its decision adverse to Rainier under the "Changes" clause, the Board indicated it would have allowed compensa-

---

6. Plaintiffs ask us to find that the whole $50,148 is recoverable, but we cannot say that the record conclusively shows that all of the officers' time (during the claim period) was attributable to the constructive change. The Board, which is the fact-finder, must therefore make the determination initially.

tion to Rainier for its increased travel and interest expense flowing from the test failure problem. The defendant now concedes that the contractor is entitled to its travel expenses.[7]

■ The Government still contests the allowance of interest,[8] but we reject this argument. In November 1954, before Rainier submitted its present claim for an equitable adjustment, the Department of Defense—which had previously, as a matter of policy, denied interest as a cost under an equitable adjustment—changed its policy to allow interest on borrowings, as part of equitable adjustments under fixed-price contracts. Since that time the ASBCA has allowed such interest in a large number of instances. See Kaman Aircraft Corp., ASBCA No. 10141, 66–1 BCA ¶5581 at 26081, May 18, 1966.[9] We hold this long-standing practice allowable, and not in conflict with 28 U.S.C. § 2516(a) (1964)[10] or the decisions implementing that Congressional policy. The statute and its policy apply to demands for damages in "breach" claims against the United States where the plaintiff seeks compensation for delay in payment. The demand here is not based upon a "breach" but upon a change compensable under the "Changes" article which entitles the contractor to reimbursement for the resulting "increase * * * in the cost of performance of this contract." Extra interest on the borrowed money became due from Rainier because of the slowdown, and under generally accepted principles was undoubtedly an increased cost of contract performance attributable to the change.

The "Changes" article thus contemplated that increased interest costs on borrowed money could be "in the very same category as more tangible costs of construction." See Phillips Constr. Co., Inc. v. United States, 179 Ct.Cl. 54, 58, 374 F.2d 538, 540 (1967) (interpreting construction contract under the Capehart Housing Act). Conversely, the amounts sought by these plaintiffs are not compensation for the Government's delay in making payment, as in Ramsey v. United States, 121 Ct.Cl. 426, 431–433, 101 F.Supp. 353, 355–357 (1951), cert. denied, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952), and Komatsu Mfg. Co., Ltd. v. United States, 132 Ct.Cl. 314, 131 F.Supp. 949 (1955), where in "breach" cases the claimants had to borrow money because the Government did not timely pay them sums due and owing.

Plaintiffs ask us to hold that their interest computation ($3,236.83) is the only permissible one on the record, but this calculation involves assumptions disputed by the defendant whose auditor reached a lower figure. Here, too, we cannot say that only the contractor's conclusion is acceptable. The Board will have to make the determination, either on the present record or after further evidence is produced.

For these reasons, we hold that the contractor was entitled to an equitable adjustment under the "Changes" article and that the Armed Services Board of Contract Appeals erred in holding otherwise. The proceedings here will have to be suspended for 90 days to allow the parties to return to the Board for a determination of the amount of the equitable adjustment, in accordance with this opinion.

7. While the Board made findings regarding Rainier's increased travel expense ($2,706) which both parties accept, no comparable findings were made with respect to any additional interest expense.

8. Rainier financed operations under the parachute contract with a $450,000 bank loan.

9. The Board's decisions in the cases included in Phillips Constr. Co., Inc. v. United States, 179 Ct.Cl. 54, 374 F.2d 538 (1967), did not depart from this principle but denied interest on other grounds.

10. "Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof."

## CONCLUSION OF LAW

On review of the administrative record herein, it is concluded that the Armed Services Board of Contract Appeals erred in failing to grant Rainier an equitable adjustment under the "Changes" clause. Further proceedings here shall be suspended for 90 days so that the parties can return to the Board for determination of the amount due the plaintiffs in accordance with the foregoing opinion. Plaintiff shall comply with Rule 100 and the General Order of April 1, 1968.