**COLEY PROPERTIES CORP.**

v.

**The UNITED STATES.**

**No. 362–74.**

United States Court of Claims.

Feb. 21, 1979.

Gerald Walpin, New York City, attorney of record, for plaintiff; Joel W. Sternman, Theodore M. Grossman, and Rosenman, Colin, Freund, Lewis & Cohen, New York City, of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COW-
EN, Senior Judge, and SMITH, Judge.

## ON PLAINTIFF'S MOTION FOR SUM-MARY JUDGMENT AND DEFEND-ANT'S CROSS–MOTION FOR SUM-MARY JUDGMENT

FRIEDMAN, Chief Judge.

This Wunderlich Act case is before the court on cross-motions for summary judgment pursuant to Rule 166(b). Plaintiff Coley Properties Corp. ("Coley") challenges the decision of the Postal Service Board of Contract Appeals insofar as it denied Coley recovery of certain costs and losses it incurred as a result of delays the Post Office Department ("Post Office") caused in the construction of a building by plaintiff for the Post Office. We reverse the Board on one issue and affirm it on the others.

## I.

In 1964 the Post Office solicited bids on alternative plans for construction of a postal facility on government-owned land in New York City. Both plans provided for sale of the land to the successful bidder, construction of a postal facility in compliance with Post Office plans and specifications, and lease of the postal facility to the Post Office. All bids were to be stated in terms of annual rent payable for the postal facility; compensation for the construction was to be provided through the rental payment. Bids were sought on an alternative basis. Scheme A provided for construction of a commercial office tower above the postal portion, and Scheme B provided for construction of a Post Office alone.

The plaintiff submitted bids under both plans, and was awarded the contract on its Scheme A bid. Under its bid Coley agreed to (1) purchase the construction site, (2) build on that site a single building, and (3) lease the postal portion of the building for a term to be agreed upon. In practical terms construction of the tower portion could not begin until the postal portion was topped out.

The Post Office anticipated that commercial utilization of the air space above the Post Office would result in lower rentals for the postal portion. In fact, bids for postal rentals under Scheme A were considerably lower than those submitted under Scheme B, and were based in substantial part upon the anticipated cost of construction and date of completion of the tower portion. Any increase in the estimated cost and duration of tower construction necessarily would increase the total rent in the bid.

The basic terms of the postal portion of the contract were embodied in a written Agreement to Lease ("Agreement"). The Agreement provided for completion of the postal portion of the building within 1,260 days from the bid acceptance date and for completion of the tower within 3 years of acceptance of the postal portion by the Post Office. The Agreement allowed Coley considerable latitude in tower construction. Basically, except for the 3-year provision, a requirement that tower construction not interfere with postal space and operations, and limitations upon Coley's discretion to control overall tower size and exterior design, the Post Office had no voice in tower plans and specifications. The Post Office could object to tower plans and specifications only to the extent they were inconsistent with these express, general requirements set forth in the Agreement.

The Agreement established a basic lease term of 30 years for the postal portion, at an annual rental of $1,340,000, followed by eight 5-year renewal terms at reduced rentals beginning with the third renewal term. The Agreement contained a provision, similar to that in most government contracts, permitting the Post Office unilaterally to make changes in the Agreement ("Changes Clause"). That provision authorized the government to order changes in drawings and specifications within the "general scope" of the contract, and provided that plaintiff would receive an equitable adjustment for increased or decreased costs resulting from such changes. It also authorized the government to amortize, over the lease term, any balance due under the

Changes Clause, and limited the changes the government could require to those costing not more than a total of $950,000.[1]

During the construction of the building the Post Office ordered a large number of changes, which resulted in delay in the completion of construction of both the postal and the tower portions of the building. Coley sought an equitable adjustment for its increased cost and the delays in completion of the building resulting from the changes.

The Postal Service Board of Contract Appeals ("Board"), in decisions dated 1975 and 1977, held (1) that changes in specifications ordered by the Post Office Department resulted in a delay of 164 days in completion of the postal portion, and in an average delay of 91 days in completion of the tower; (2) that the plaintiff was entitled to recover $938,224 for "increased performance costs due to the impact of the changes ordered by respondent" attributable to the postal portion ("impact costs" cover the increased out-of-pocket expenditures the plaintiff incurred, including real estate taxes, premium time, general conditions expense, field and supervisory payroll, and home office overhead); and (3) that the plaintiff was *not* entitled to recover: (a) impact costs attributable to the tower portion, (b) rentals it would have received from the postal and tower portions during the time for which construction was delayed, (c) construction loan interest paid during the delay period, and (d) interest on the award of the Board.

Plaintiff here does not challenge the Board's findings regarding the length of the delay or the amount of the award for postal portion impact costs, and the defendant does not challenge the latter award. Plaintiff does challenge the Board's denial of recovery for tower impact costs, rentals attributable to the postal and tower portions during the delay period, construction loan interest, and interest on the award.

■ We reverse the Board's denial of recovery for tower impact costs and affirm

its other rulings. In so holding, we apply the settled rule that in Wunderlich Act cases we decide questions of contract interpretation *de novo. Cf., e. g., C. H. Leavell & Co. v. United States*, 530 F.2d 878, 208 Ct.Cl. 776 (1976); *Int'l Tel. & Tel. v. United States*, 453 F.2d 1283, 197 Ct.Cl. 11 (1972).

II.

■ A. The basic issue underlying the plaintiff's claim for tower impact costs is whether the equitable adjustment provision of the Changes Clause of the Agreement applies to construction of the tower as well as to construction of the postal portion. The Changes Clause states in part:

The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of *this Contract* if within its general scope. If such changes cause an increase or decrease in the Lessor's cost of, or time required for, performance of *the contract*, an equitable adjustment shall be made and *the Agreement to Lease* shall be modified in writing accordingly. [Emphasis supplied.]

Specifically, the question is whether the words "the contract" apply only to the postal portion of the contract rather than to the entire contract to build an office building and lease the postal portion. The government contends that because the authority in the first sentence to issue change orders is limited to "this Contract," *i. e.*, the Lease Agreement, the plaintiff's right under the second sentence to "an equitable adjustment" in "the contract" covers only the portion subject to change orders; and that since the government could not issue change orders covering the tower portion of the building, the plaintiff is not entitled to an equitable adjustment for impact costs for the tower.

The issue is not that simple, however. The Changes Clause is ambiguous. The first sentence refers to "this Contract."

---

1. This provision stated: "Anything herein to the contrary notwithstanding the Government shall in no event require the undersigned to accept a net dollar amount of increase or de-crease in completion costs as a result of change greater than $950,000.00 without written agreement thereto."

The second sentence, however, refers both to "the contract" and "the Agreement to Lease." The parties presumably intended to distinguish between these two concepts. In order properly to interpret this verbal morass, we must examine the language in light of the basic transaction between the parties.

The two sentences cover basically different issues. The first sentence authorizes the contracting officer to order changes in plans and specifications. The second sentence deals with the liability of the Post Office for impact costs incurred due to such change orders. The first sentence authorizes the contracting officer to change aspects of performance in which the Post Office had some substantial interest. The primary concern of the Post Office in the tower was financial—to reduce the rent it would pay for the postal portion of the structure. Its interest in the physical characteristics of the tower was aesthetic. The Lease Agreement took care of that interest by providing that the tower be within a certain size range, that it be completed within a specified time, and that the exterior design be maintained. The Post Office had no particular interest, however, in other aspects of tower construction which the Lease Agreement did not cover. Accordingly, the first sentence authorized the contracting officer to order only changes affecting the postal portion of the building. This limited authority was given by authorizing changes "in the drawings and/or specifications of this Contract," and in context "this Contract" means the Lease Agreement.

The second sentence of the Changes Clause covers increases or decreases in Coley's "cost of, or time required for, performance of the contract." It authorizes financial relief for Coley for increased costs incurred as a result of change orders and financial relief for the government if change orders reduced Coley's costs. There is no indication that he parties intended this broad language to cover only increased or decreased costs in the construction of the postal portion of the building and to exclude from equitable adjustment increases or decreases in cost in the tower portion that directly resulted from changes in the postal portion.

To the contrary, the construction of the two portions of the building were part of the single business transaction in which Coley undertook to construct upon property the government sold to it a large office building and to lease a portion of that structure to the Post Office. The postal part of the structure and the tower were closely intertwined since the total rent the Post Office would have to pay for the postal portion was in large measure determined by Coley's costs of construction for the entire structure. The government itself recognized this economic fact of life, since the invitation for bids sought proposals for construction of either a complete office building, including the postal portion, or a separate postal building itself.

These two interrelated elements of the transaction between Coley and the Post Office cannot be separated into and treated as two independent transactions—as the Board of Contract Appeals did and the government urges us to do—so as to deny Coley an equitable adjustment to cover the increased costs it incurred in completing the tower portion of the building as a result of the changes the government ordered in the postal portion. The basic rationale upon which the Board ordered an equitable adjustment to cover the impact costs of the changes directed in the postal portion—a ruling the government has not challenged—also requires a similar equitable adjustment to cover Coley's impact costs on the tower portion.

■ B. The Board found, and the government here contends, that since the changes the government ordered did not prevent Coley from complying with the contract requirement that it complete the tower within 3 years after the postal portion of the building was turned over to the government, the tower impact costs are *damnum absque injuria*, and the plaintiff is not entitled to an equitable adjustment for those costs.

Implicit in this contention are the assumptions that (1) the only obligation the contract imposed upon both parties for tower construction during that period was that Coley complete construction within 3 years, and (2) the parties understood and contemplated that within that period there might be delays that would prevent completion of construction on time. Coley argues that the 3-year provision defined only its own duty to complete performance, and did not limit the government's liability for interference with performance during that period. The plaintiff states that it contemplated and intended completion well within the period. The government responds that Coley never informed it about plans for early completion and that any such plans never were made a part of the Lease Agreement.

As previously indicated, the Post Office recognized that the rent Coley would receive from the tower was critical in determining the rent the Post Office would have to pay for its facility; the greater the rent Coley could obtain from the tower, the lower the rent it would charge the Post Office. The Post Office realized that the greater the time required for completion of the tower, the greater would be the plaintiff's cost of performing the entire contract, including the cost of construction of the postal portion.

An implicit condition in the agreement between Coley and the Post Office was that the former could complete the tower portion as soon as possible and thereby start the flow to it of the rents from the tower that were an important factor in fixing the cost of the postal portion to the Post Office. The delay that the changes the government ordered in the postal portion caused Coley in completing the tower portion, with its concomitant additional expenses to Coley in completing the tower, is an item of additional impact cost for which the government is liable, even though Coley still was able to complete the tower portion within 3 years after the postal portion was turned over to the Post Office.

## III.

The plaintiff seeks an equitable adjustment for the rents on the postal and tower portions it did not receive during the respective delay periods. Coley argues that the Board's award of the amount of the real estate taxes it paid on the postal portion constitutes a recognition that the owner-related expenses of a contractor/owner are compensable under the Changes Clause to the extent that such expenses were out-of-pocket costs; that its "lost" rent represents a real economic injury; and that the distinction between out-of-pocket costs and rents it did not receive fails to take into account the unusual, dual nature of Coley's role as owner and contractor. The government responds that loss of rent is not a performance cost and that plaintiff's theory is also invalid for other reasons.

We agree with the Board that Coley is not entitled to an equitable adjustment under the Changes Clause for the rents it did not receive during the periods of delay. The Changes Clause covers changes that cause "an increase . . . in the . . . cost of . . . performance of the contract . . . ." The purpose of this provision is to compensate the contractor for the unanticipated and extra out-of-pocket expenses it incurred in performing the contract as a result of the changes. Although Coley suffered economic detriment when it failed to receive the rents it had expected during the period of delay, this loss of income was not an additional "cost of . . . performance of the contract." The rents that Coley did not receive did not impose any out-of-pocket expenses upon it but merely reduced its income.

The four cases upon which Coley relies do not support its position. Two of them involve rents that the contractor itself had paid during the delay rather than, as here, rents it failed to receive. *Sundstrand Turbo v. United States*, 389 F.2d 406, 182 Ct.Cl. 31 (1968); *DeLong v. United States*, 175 F.Supp. 169, 146 Ct.Cl. 289 (1959). The two other cases were situations in which the government had breached a contract, and the rents the contractor lost as a result

were allowed as an item of damage for the breach. *J. D. Hedin Constr. Co. v. United States*, 456 F.2d 1315, 197 Ct.Cl. 782 (1972); *Chain Belt Co. v. United States*, 115 F.Supp. 701, 127 Ct.Cl. 38 (1953). Coley has cited no case, and we know of none, in which loss of expected income during the period of delay has been viewed as a "cost" of performance of the contract for which the contractor received an equitable adjustment under the Changes Clause.

## IV.

Plaintiff argues that the additional interest it paid on construction loans during the delay period was an increased cost of performance under the Changes Clause. Ordinarily, increased interest on borrowed money is a cost item that is compensable under the Changes Clause. *See Bell v. United States*, 404 F.2d 975, 984, 186 Ct.Cl. 189, 206 (1968); *Phillips Constr. Co. v. United States*, 374 F.2d 538, 540, 179 Ct.Cl. 54, 58 (1967). In this case, however, paragraph 2 of the Agreement bars an award for that item. It states:

> Increased or decreased performance costs shall be computed and paid without any charge or allowance for interest, including interest on borrowed money.

In terms this provision explicitly states that "interest on borrowed money" is not to be included in determining increased performance costs.

The plaintiff, however, argues that this provision does not mean what it says. It contends that the prohibition is part of a provision permitting the Post Office to amortize up to $950,000 in increased performance costs over the term of the lease by adding those costs to the rent it will pay. It argues that the parties understood that Coley would withhold any claims for additional costs until completion of construction, at which point the total amount to which Coley was entitled would be determined. Coley argues that the prohibition in paragraph 2 applies only to interest costs incurred during the time necessary to compute the total equitable adjustment Coley was to receive and not to interest paid during the original delay period.

There is nothing in either the language or structure of section 2 of the Agreement that supports the narrow reading Coley would give to the broad language of the prohibition against allowing interest on borrowed money as an item of increased performance cost. If the parties had intended the prohibition to have the limited scope Coley ascribes to it, they would not have used the unqualified wording that "increased . . . performance costs shall be computed and paid without any charge or allowance for . . . interest on borrowed money." The interval between completion of construction and the determination of the amount of increased costs to which Coley was entitled necessarily occurred only after performance of the contract had been completed. The "interest on borrowed money" that the provision excludes from the computation of increased cost is interest that constitutes a cost of performance and not an expense incurred while that cost was being ascertained.

## V.

Coley's claim for interest on the equitable adjustment the Board awarded founders on 28 U.S.C. § 2516(a) which states: "Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof." Section 2516 embodies the "traditional immunity of the Government from the burden of interest unless it is specifically agreed upon by contract or imposed by legislation." *United States v. Goltra*, 312 U.S. 203, 207, 61 S.Ct. 487, 490, 85 L.Ed. 776 (1941). Neither condition exists here. The contract does not provide for interest on the award, and no statute authorizes it.

Coley, however, contends that section 2516(a) is inapplicable in this case. It argues that in the Postal Reorganization Act of 1970, 39 U.S.C. §§ 101 *et seq.* ("Reorganization Act"), Congress waived the sovereign immunity of the Postal Service, and

that the Postal Service therefore is not "the United States" within the meaning of the statute. Although Congress waived the sovereign immunity from suit of the Postal Service in that Act, that does not make Coley's claim any the less a claim against the United States. Indeed, if that were the effect of the legislation, we would have no jurisdiction over this suit at all. The question is simply whether the Reorganization Act is one "expressly providing" for interest against the United States.

In *Butz Eng'r Corp. v. United States*, 499 F.2d 619, 204 Ct.Cl. 561 (1974), we held that this court has jurisdiction over a suit against the Postal Service because such suit is one against the United States.[2] The language and legislative history of the Reorganization Act showed, we concluded, that Congress did not intend "to strip an overhauled [Post Office] of its public service character." 499 F.2d at 623, 204 Ct.Cl. at 569. More recently, in *Fruehauf Corp. v. United States*, 578 F.2d 1389 (Ct.Cl.) (1978), we adopted the recommended decision of Trial Judge White denying a claim for interest against the Postal Service. In holding that 28 U.S.C. § 2516(a) barred interest in a suit against the Postal Service, the trial judge implicitly recognized that such suits were claims against the United States within the meaning of that section. *Cf. also National Association of Letter Carriers, AFL–CIO v. United States Postal Service*, No. 77–1442, slip op. at 17 (D.C.Cir. Dec. 8, 1978) (because Congress has not "expressly waived the immunity of the Postal Service with respect to attorneys' fees," they are not recoverable from the Service under the rule that a general waiver of sovereign immunity should not be construed to extend to attorneys' fees unless Congress has clearly indicated that it should).

 Those decisions and their rationale require rejection of Coley's claim for interest on the award. The claim against the Postal Service is a claim against the United States and, as noted, this court cannot award interest because neither the contract nor a statute expressly authorizes it. Although section 401 of the Reorganization Act waives the Postal Service's immunity from suit, that action is not a waiver of immunity from interest. In *United States v. Omaha Indians*, 253 U.S. 275, 40 S.Ct. 522, 64 L.Ed. 901 (1920), the Supreme Court held that an Act of Congress conferring on this court jurisdiction to adjudicate all claims of the Omaha tribe against the United States, including equitable claims, did not authorize the award of interest. *See also United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947). For a statute to permit this court to award interest against the United States, the Act must "expressly" so provide (28 U.S.C. § 2516(a)). A mere waiver of sovereign immunity from suit does not satisfy that requirement.

## CONCLUSION

We reverse the Postal Service Board of Contract Appeals insofar as it denied Coley recovery for tower impact costs and affirm it in all other respects. Although Coley argued that the amount of those costs is undisputed and urges the court itself now to award them, the defendant questions and challenges Coley's figures. We therefore remand the case to the Board to determine those costs.[3]

---

2. Although the suit is against the United States, the Postal Service will pay out of its funds the judgment against the United States (31 U.S.C. § 724a).

3. Plaintiff is designated to advise the court of the status of the Board proceedings on remand. *See* Rule 149(f).