**L'ENFANT PLAZA PROPERTIES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 67–75.

United States Claims Court.

Oct. 11, 1983.

---

Warren K. Kaplan, Washington, D.C., for plaintiff; William D. Sullivan, Melrod, Redman & Gartlan, Washington, D.C., of counsel.

Randall B. Weill, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

OPINION

MAYER, Judge.

This is another chapter in the protracted litigation over construction of a building complex in an urban renewal area of Washington, D.C. Plaintiff L'Enfant Plaza Properties, Inc. (L'Enfant) brought suit in the United States District Court for the District of Columbia in 1975 to recover $10 million for breach of five ground leases by the District of Columbia Redevelopment Land Agency (RLA). On L'Enfant's motion, the case was transferred to the United States Court of Claims where defendant moved to dismiss on grounds that the court lacked jurisdiction because RLA was not a federal instrumentality. The court held that RLA was a federal instrumentality for purposes of Tucker Act jurisdiction, *L'Enfant Plaza Properties, Inc. v. United States,* 209 Ct.Cl. 727 (1976), and the case proceeded to trial.

After trial of the liability aspect of the case, the court held, insofar as is pertinent here, that the leases were breached by RLA and the United States is liable for any damages plaintiff thereby incurred. Resumption of the trial to determine damages was ordered. *L'Enfant Plaza Properties, Inc. v. United States,* 230 Ct.Cl. 447, 678 F.2d 167 (1982).

The case was transferred to the United States Claims Court, *see* Federal Courts Improvement Act of 1982 § 403(d), Pub.L. No. 97–164, 96 Stat. 58 (to be codified in 28 U.S.C. § 171 note), and a month before trial L'Enfant amended the complaint increasing the amount sought to $60 million. At trial, L'Enfant presented evidence on its damages claim for breach of only one of the leases, and abandoned any claim concerning the other four.

FACTS

The L'Enfant Plaza project was initiated in the early 1960's by retired Lieutenant General Elwood R. Quesada, who had previously served as Special Assistant to the President for Aviation, Administrator of the Federal Aviation Administration, vice president and director of Olin Industries, and as an officer and director of Lockheed Aircraft. In November of 1965, General Quesada, as president of L'Enfant,[1] entered into five ground leases with RLA for the redevelopment and improvement of five parcels of land located in an urban renewal project in the area known as near southwest Washington, D.C. L'Enfant planned to use the land, one of only two major areas in the urban renewal tract designated for commercial development, to construct an office, hotel, and retail complex designed by noted architect, I.M. Pei.

At this time, near southwest was a "pioneering area," being developed primarily for residential or government office buildings. L'Enfant's neighbors were to be government agencies such as the Federal Aviation Administration, the National Aeronautics and Space Administration (NASA), the General Services Administration (GSA), the Department of Transportation, and the Department of Housing and Urban Development, rather than other commercial enterprises. Most commercial office space was located in an area of northwest Washington known in the real estate industry as the "golden triangle."

Construction of the L'Enfant project was in three phases. Phase one was construction of the North and South Office Buildings, each with approximately 247,000 square feet of rentable office space, and the Centre Building which connected the complex and whose roof would serve as an outdoor plaza. The North and South Buildings were almost entirely preleased and were ready for occupancy in the fall of 1968.

The North Building was leased to two large tenants, Boeing and Bellcomm, a subsidiary of AT & T, which wished to be near NASA because of their work on the space program. Approximately 80 percent of the

1. L'Enfant Plaza Properties, Inc., is the successor in interest to the five corporations which entered into the leases: L'Enfant Plaza North, Inc., L'Enfant Plaza South, Inc., L'Enfant Plaza Centre, Inc., L'Enfant Plaza East, Inc., and L'Enfant Plaza West, Inc.

South Building was leased to Comsat, a communications satellite firm, which also wished to be near NASA. The remaining space in the South Building was leased to the Washington Metropolitan Area Transportation Authority. When Boeing agreed to move to the development, L'Enfant assumed Boeing's lease for office space in northwest Washington and absorbed the $47,000 cost of remodeling that space.

Phase two of the project was construction of the West Building, a 629,654 square foot office building, more than twice as large as either the North or South Buildings. It is the claim pertaining to this phase that remains for decision in this case.

The 99-year ground lease (Lease) for the parcel of land on which the West Building was to be constructed provided that possession of the leased property would vest in L'Enfant 35 months after the date of the Lease, but that, at the request of L'Enfant, possession may vest at an earlier or later date; L'Enfant would pay "carrying charges" of $7,306.25 per month to RLA for the period before vesting; L'Enfant was to begin construction of improvements on the leased property within 15 days after vesting; the specifications for improvements to the property would conform to the provisions of the urban renewal plan and be subject to approval by RLA; at any time within 15 years of completion of construction, L'Enfant would have the exclusive right to purchase the fee simple title to the leased property; the Lease would be deemed to be made in the District of Columbia "for all purposes and intents;" and in the event of breach either party could recover from the other "all damages and reasonable expenses and costs."

In accordance with the Lease, L'Enfant sought RLA's approval of the plans for construction of the West Building. On October 31, 1966, L'Enfant submitted a plan which corrected all previous deficiencies noted by RLA except for one concerning the width of parking spaces in the underground garage. The plan was rejected because the parking space width specifications were unacceptable under the urban renewal plan. RLA suggested in February of 1967 that L'Enfant seek an amendment to the urban renewal plan waiving the parking space width requirement for the West Building. In March, L'Enfant did so and, at L'Enfant's behest, RLA submitted the request to the National Capital Planning Commission (NCPC). The requested amendment was approved by NCPC and was adopted by the District of Columbia Council in November of 1967.

On March 14, 1968, L'Enfant inquired about the status of the waiver request, and was told by RLA on March 25 that it had been approved. Thus, approximately 16½ months elapsed between October of 1966 when L'Enfant submitted its construction plan and March of 1968 when it was notified by RLA that the parking space width requirement was waived.

The Court of Claims held that RLA itself had, and should have realized it had, the power to waive the parking space requirement and its failure to do so was unreasonable. The court further held that, having assumed responsibility for submitting L'Enfant's proposed amendment to the NCPC and city council, RLA was responsible for informing L'Enfant when the proposal was approved, and the failure to do so was unreasonable. These two elements of inaction were a breach of contract for which plaintiff is entitled to damages. 230 Ct.Cl. at 456, 678 F.2d at 173.

From April through December of 1968, the parties had additional discussions about the height of the building, window design, placement of trees, and other aesthetic matters. In January 1969, RLA approved final plans for construction.

Under the terms of the Lease, vesting of possession of the West Building site was to occur in October of 1968, but RLA approved L'Enfant's request that it be delayed until December 1, 1968. A second request to delay vesting beyond December 1 because of L'Enfant's imminent purchase of the property as permitted by the Lease was also approved. In February of 1969, L'Enfant secured a $23 million construction loan for the West Building bearing interest floating

at one percent over the prime rate and purchased the West Building property from RLA with a $2,505,000 loan obtained as part of its permanent financing commitment. Construction of the West Building began on February 18, 1969, less than a week after purchase of the property, and was completed in accordance with the Lease by July 16, 1971. While only one percent of the building was preleased, 23 percent was leased within a year of completion.

In early 1970, over a year before completion, L'Enfant was invited by GSA to bid on the lease of 600,000 square feet of space for the Environmental Protection Agency (EPA), but declined. General Quesada believed GSA was an undesirable tenant and the rental rates usually paid by GSA would result in L'Enfant losing money. The owners of the Waterside Mall complex, the other major commercial project in near southwest Washington, however, agreed to lease space for EPA.

In January of 1971, about six months before its completion, L'Enfant offered to lease the West Building to GSA. It soon withdrew the offer, however, in the belief that the West Building was architecturally and aesthetically superior to buildings normally leased by the government thereby making it unlikely the parties could reach agreement.

At approximately the same time it withdrew its offer to lease, L'Enfant offered to sell the West Building upon completion to GSA, either in its role as agent for the InterAmerican Development Bank (Bank), which had retained GSA to assist in the purchase of an office building, or as agent for the federal government. Negotiations for sale of the building to the Bank continued through the fall of 1971. In September, the United States Postal Service also expressed interest in purchasing the property.

In June of 1972, less than a year after completion, the West Building was sold to the Postal Service for $29,851,241, resulting in a 32 percent return to L'Enfant's investors, a high rate of return on a real estate investment. L'Enfant reinvested the profits in construction of the East Building hotel and offices, phase three of the project.

Though the period between L'Enfant's submission of construction plans and notification of approval of the waiver was 16½ months, the parties stipulated that commencement of construction of the West Building was delayed by only 15 months.[2] They also stipulated that L'Enfant's construction costs and interest on the construction loan would have been $1,906,291 less if the West Building had been completed 15 months earlier. This cost differential can be attributed to inflation and increases in prime interest rates.

### CONTENTIONS

Essentially, plaintiff's theory of the case is that the Washington market for new office space is cyclical, marked by periods of oversupply relative to demand, thereby making the time a new office building enters the rental market of vital importance. As a result of the RLA caused delay in waiving the parking space width requirement, the West Building entered the market at the worst time during the period 1968 through 1982. Had it entered the market 15 months earlier, it would have

**2.** At a hearing just before trial, defense counsel moved to withdraw from this stipulation, arguing that he had mistakenly agreed to it and it was inconsistent with his pretrial submission of the issues. Plaintiff opposed the motion on the grounds that its preparation for trial, including a report from an expert witness, was based upon the stipulation of a 15-month delay. After reviewing correspondence between the parties from October of 1982 and a hearing on the motion, the court denied defendant's request to withdraw from the stipulation. The court concluded it was not the result of inadvertence, but was discussed and negotiated by the parties over a period of many months; was relied upon by the parties and their experts; was a reasonable and permissible interpretation of the decision of the Court of Claims; and prejudice to plaintiff would result if withdrawal were permitted so late in the proceedings. *See Hooker Chemicals and Plastics Corp. v. United States,* 219 Ct.Cl. 161, 185, 591 F.2d 652, 664 (1979); *Manufacturers Service Co. v. United States,* 217 Ct.Cl. 387, 402 n. 18, 582 F.2d 561, 571 n. 18 (1978).

enjoyed the same success as the North and South Buildings and, therefore, would not have been sold less than a year after completion. It would have been retained by L'Enfant to produce profits for years to come. As a direct result of the 15-month delay in construction, L'Enfant suffered economic damage of $65,052,699.

The government's position is that the rental market was no different when the West Building was completed than 15 months earlier and that, in any event, the West Building cannot be compared to the North and South Buildings or others of similar size because the market for large office buildings is different from that for small ones. Nor is a comparison between the experience of the West Building with that of buildings in other areas of metropolitan Washington valid because of the uniqueness of the near southwest setting. L'Enfant's damage claims are speculative, unproven, or barred by statute.

## DISCUSSION

RLA's liability for breach of contract has been established, but L'Enfant must still produce satisfactory evidence from which the court can determine the extent of its loss. *Roberts v. United States,* 174 Ct.Cl. 940, 946, 357 F.2d 938, 943 (1966). To be entitled to an award of damages, L'Enfant must prove that it actually incurred damage as a result of RLA's breach. *See Gardner Displays Co. v. United States,* 171 Ct.Cl. 497, 500, 346 F.2d 585, 587 (1965); *Commerce International Co. v. United States,* 167 Ct.Cl. 529, 536, 338 F.2d 81, 86 (1964).

As an initial matter, the parties agree that the purpose of an award of damages for breach of contract is to place the plaintiff in as good a position as it would have been in had there been no breach. *Allan Construction Co. v. United States,* 227 Ct.Cl. 193, 204, 646 F.2d 487, 494 (1981); *Arizona v. United States,* 216 Ct.Cl. 221, 237–38, 575 F.2d 855, 864 (1978). They differ, however, over what that entails. L'Enfant argues that the scope of recovery is "uncompromisingly broad and all-inclusive" because the Lease provides for recovery of "all dam-

ages" in the event of breach. It therefore seeks lost rental profits for over 15 years, interest on those profits, increased costs of construction and financing, and costs and attorney's fees. It characterizes the increased costs of construction and financing as a "garden variety construction delay claim." Defendant, on the other hand, argues that damages are limited to those foreseeable by the parties and not barred by statute.

Contrary to L'Enfant's view, however, this was not a breach of a contract to construct a building for the government. It was a breach of a lease of real property for which there is an established measure of recovery for delay in vesting possession. Characterization as a "garden variety construction delay claim" misconstrues the nature of the agreement. Under the Lease, L'Enfant agreed to construct improvements on the property and to maintain them in a manner which prevents "a recurrence of slums and blight," but it was entitled to retain title to the improvements for the 99-year term of the Lease. This was a contract to lease real property on which L'Enfant would construct a building for its own use.

The delay at issue here did not occur during construction of the West Building, but before L'Enfant was vested in possession of the property. The Court of Claims found RLA liable for failing to waive the width requirement between October of 1966 and March of 1968, but possession did not vest until February of 1969. If RLA had recognized in 1966 that it had the authority to waive the parking space width requirement, L'Enfant could have received approval of its construction plans 15 months earlier and exercised its option under the Lease to vest earlier. The result of RLA's failure to waive the requirement was to delay vesting, thereby depriving L'Enfant of the use of its leasehold during this period.

The measure of recovery for breach of a contract or covenant to grant possession under a lease is the difference between the rental value of the premises and the rent agreed upon, for the period

during which the lessee is deprived of possession, plus any sums paid for that period. *See Bedrosian v. Peoples Mortgage Corp.,* 182 F.2d 395 (D.C.Cir.1950); *Peoples Mortgage Corp. v. Bedrosian,* 154 F.2d 332 (D.C. Cir.1946); *see also* 2 S. Williston, *A Treatise on the Law of Contracts* § 1404A (3d ed. 1968); Annot., 88 A.L.R.2d 1024 (1963). A lease with the federal government will generally be governed by uniform federal law, rather than the law of the state where it was made or performed, *Keydata Corp. v. United States,* 205 Ct.Cl. 467, 482, 504 F.2d 1115, 1123 (1974), and this court is free to adopt the "best in modern decision and discussion" as the federal rule. *Id.* at 480, 504 F.2d at 1122. In this case, the federal and local rules coincide. L'Enfant, however, presented no evidence, if any there was, of a difference between the rental value of the West Building property and the rent agreed upon.

■ There is, however, an element of general damage which L'Enfant has not expressly requested, but to which the court believes it is entitled. If RLA had not improperly delayed the waiver of the parking space width requirement, vesting would have occurred earlier and L'Enfant would not have been obliged to pay the specified monthly carrying charges for a period during which it should have been in possession. It is entitled to recover these expenditures. *See Peoples Mortgage Corp. v. Bedrosian,* 154 F.2d at 333. In light of the stipulation that construction was delayed by 15 months and the fact that RLA would have required some time to review the corrected plans, the court concludes it just to use the 15 month figure in calculating these damages. At the specified rate of $7,306.25 per month, plaintiff should recover $109,593.75.

■ Apart from general damages, a plaintiff lessee may recover special damages if it can prove that the item of loss was within the contemplation of the parties at the time they contracted and that the loss was the proximate result of the breach by the lessor. *See Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 886, 524 F.2d 707, 720 (1975); *see also* 2 S. Williston, *A*

*Treatise on the Law of Contracts* § 1404A (3d ed. 1968); Annot., 88 A.L.R.2d 1027 (1963). Entitlement to these damages is therefore governed by the facts of each case. *See Chain Belt Co. v. United States,* 127 Ct.Cl. 38, 59, 115 F.Supp. 701, 715 (1953). If L'Enfant is to recover, it must demonstrate that each of the four elements of loss it seeks satisfies this test.

*Lost Rental Profits*

■ The major element of special damages sought by L'Enfant is lost rental profits for a period of at least 15 years, from April 1970, when the West Building would have been completed but for the delay, until some future time beyond the date of trial. It asserts that the normal expectation is that a corporation like L'Enfant will hold a structure like the West Building for 15 to 20 years; it would not have sold the building during this period except for RLA's breach; all concerned expected the new enterprise to be a profitable one; and it is therefore entitled to receive lost rental profits for this period. L'Enfant concedes that these profits are not precisely calculable, but relies on its expert witnesses' testimony and reports as sufficient evidence for the court to make an assessment in the nature of a jury verdict. *See Specialty Assembling and Packing Co. v. United States,* 174 Ct.Cl. 153, 184, 355 F.2d 554, 572 (1966).

Its experts calculated the loss of profits by determining a "but for delay" stream of net revenues in "current dollars" from April 1, 1970, to March 1, 1983, $22,648,500, subtracting the actual net revenues received from the West Building, $3,577,766. They then added the present value of the West Building, $38,147,213, to reflect the discounted value of future net income since the "minimum expected holding period" of 15 years extends beyond the date of trial. The result is $57,217,947.

L'Enfant concedes there is no evidence that RLA foresaw that the rental market might change so drastically as to force it to sell the West Building. But it argues that the court must presume the parties to the

contract possess the commercial intelligence necessary to the undertaking. Therefore, RLA must have foreseen that L'Enfant would lose profits as a result of any delay in approving the construction plans.

Defendant responds that plaintiff is not entitled to any lost profits. The evidence is insufficient to conclude there was a change in the rental market between April 1970, when the building would have been completed but for the delay, and July 1971, when it was. Even if the court determines there was, RLA could not and did not foresee it. In any event, plaintiff's projected stream of future net revenues is speculative and not supported by the evidence. L'Enfant realized all the profits to which it is entitled when it sold the West Building.

Generally, a lessee may recover lost profits as a result of a lessor's breach of lease preventing or delaying the operation of a business upon demonstrating that the loss was contemplated by the parties, was a direct result of the breach, and can be estimated with reasonable certainty. *See Neely v. United States,* 152 Ct.Cl. 137, 146, 285 F.2d 438 (1961); *Chain Belt Co. v. United States,* 127 Ct.Cl. at 60, 115 F.Supp. at 715. But while an established business may be awarded anticipated profits based on its prior experience, a new business is generally precluded from recovering because its loss is too remote, contingent, and speculative. *Neely v. United States,* 152 Ct.Cl. at 146, 285 F.2d at 443; *Chain Belt Co. v. United States,* 127 Ct.Cl. at 61, 115 F.Supp. at 716. Remote and consequential damages may not be recovered in a common law suit for breach of contract against the United States. *Northern Helex Co. v. United States,* 207 Ct.Cl. at 886, 524 F.2d at 720; *Ramsey v. United States,* 121 Ct.Cl. 426, 433, 101 F.Supp. 353, 357 (1951).

The Court of Claims allowed a lessee to recover lost profits for a new venture in *Neely,* but that case is different from ours. Defendant there breached a mineral lease by refusing to allow strip mining. The lease was eventually assigned to another who was allowed to mine the property thereby providing the court with a reasonable basis for estimating plaintiff's lost profits. Here, L'Enfant sold the building to the government for use by the Postal Service thereby precluding a similar basis upon which to estimate future commercial rental profits.

Even though the West Building is a "new enterprise," L'Enfant sought to demonstrate its lost rental profits by presenting evidence on the experience of the earlier completed North and South Buildings and that of other buildings in the Washington rental market. This evidence, however, is not helpful in determining the likely experience of the West Building because of the significant differences among the buildings.

The North and South Buildings were not predictive of the experience of the West Building for two significant reasons. First, they each contained less than half the rentable office space of the West Building and defendant made a strong showing that unusually large office buildings have a more difficult time in the rental market than smaller ones. Indeed, in the years since these events, some developers have prudently built large buildings in stages. Second, the North and South buildings were unusual in that they had only four tenants, three of which, Boeing, Bellcomm, and Comsat, moved there to be near NASA. Together, these three tenants occupied over 440,000 square feet, and were not typical of the average Washington office space tenant in 1970–71 which occupied less than 5,000 square feet. The number of large tenants like these three was undoubtedly limited, but the evidence does not show how many, if any, similar tenants might have been available if the West Building had been completed earlier.

While General Quesada's reputation and accomplishments in public and private positions were persuasive in causing tenants like Comsat, Boeing, and Bellcomm to move to the L'Enfant complex, it would be mere conjecture for the court to conclude on the evidence presented that he or his leasing agent could have obtained enough additional tenants to fill the West Building. The most the evidence shows is that IBM ex-

pressed an interest in the L'Enfant complex in 1970, but was unable to await completion in 1971. The evidence does not show the depth of IBM's interest, but it subsequently leased space in the prime business district at a lower square footage cost than that sought for space in the West Building the same year.

A comparison of the West Building with the general office building market in metropolitan Washington is also not helpful. In 1970–71 the West Building was in a "pioneering area." Trade associations and law firms which occupied much of the office space in Washington preferred to be located in the "golden triangle" in northwest Washington's central business district or in Rosslyn, Virginia, because of their activities and the preference of people on their staffs, rather than in near southwest.

The evidence showed L'Enfant was not the only new enterprise having trouble securing commercial tenants in near southwest. Even before the West Building was completed, at a time when L'Enfant claims the rental market was better, a building located immediately west of the L'Enfant complex containing more than 550,000 square feet of office space had difficulty obtaining commercial lessees. That building was completed in early November of 1969 and remained partially vacant until August of 1970 when the remaining space was leased by GSA for the federal government. The building was built as a joint venture for the primary tenant, Group Hospitalization, Inc. (GHI), because GHI could not afford to construct a building on the site solely for its own use. The only major commercial tenant obtained for the building was Eastman Kodak which occupied less than seven percent of the space.

Similarly, L'Enfant's evidence of a change in the market was not persuasive. Vacancy rate statistics published by the Building Owners and Managers Association of Metropolitan Washington were introduced to prove a better earlier market, but they did not differentiate between vacancies in older buildings and those just completed. They also relied on voluntary re-

porting by building owners and managers who for business reasons might choose either not to participate in the survey or to report inaccurate information. The court cannot conclude they accurately reflected the state of the market.

The other office space vacancy survey discussed at trial by the experts, reports published by Julian J. Studley, Inc., were of no value because they were not regularly issued during the period in question. Consideration of all the evidence presented convinces the court that plaintiff did not discharge its burden of proving a difference in the market between April 1970 and July 1971.

Even if the court could conclude that there was a difference in the rental market and that the West Building's lost profits could be estimated with reasonable certainty, the loss claimed by L'Enfant was neither contemplated by the parties nor a direct result of the breach. No evidence was presented that the cycles of overabundance of Washington office buildings are symmetrical or can otherwise be predicted. Indeed, L'Enfant displayed no sense of urgency in the preliminary stages of the project indicating it foresaw a downturn it now says RLA should have foreseen. A manifestation of this was its dilatory inquiry about the status of its request for a waiver of the parking space width requirement. If L'Enfant had foreseen an inhospitable market, it was incumbent upon it to make every reasonable effort to mitigate its damages or run the significant risk of an uncompensated loss. *See Dittmore-Freimuth Corp. v. United States,* 182 Ct.Cl. 507, 531, 390 F.2d 664, 679 (1968).

It is apparent from the evidence at trial that during this period whether one's timing in the office rental market was felicitous was a matter of fortuity. The court will presume that both parties possessed the requisite knowledge for performance of the contract, but it will not infer that they therefore contemplated that a 15-month delay in approving the construction plans would result in a loss of profits for over 15 years.

■ L'Enfant would have the court find that the 15-month delay directly resulted in the forced sale of the building and a loss of future profits in excess of $57 million. "For a damage to be direct there must appear no intervening incident ...; the cause must produce the effect inevitably and naturally, not possibly nor even probably." *Ramsey v. United States,* 121 Ct.Cl. at 433, 101 F.Supp. at 357, *quoting Myerle v. United States,* 33 Ct.Cl. 1, 27 (1897). RLA's delay in waiving the parking space width requirement did not naturally and inevitably produce this loss. Even if it had promptly waived the requirement, there is insufficient evidence the West Building would have found itself in a good rental market and been a commercial success. In essence, L'Enfant seeks indemnification against all loss in a 99-year lease for an office building constructed in a pioneering area. Absent a clearly expressed intention and compelling evidence, the court cannot accept a theory of recovery that requires the United States to indemnify a party for all losses to which it supposes itself entitled. *See S.W. Electronics & Mfg. Co. v. United States,* 228 Ct.Cl. 333, 347, 655 F.2d 1078, 1086 (1981).

The court is convinced that L'Enfant's decision to sell the West Building at a handsome profit was a reasonable business judgment. Just as L'Enfant now asserts that the 1983 value of the West Building represents the capitalization of future net income, so too did the 1972 sale price in an arm's-length transaction. L'Enfant's own real estate expert stated in his report that "[a] buyer of income property invests in anticipation of future benefits to be achieved through possession, operation, or in the form of capital gain." He added that "value is created by the expectation of benefits to be derived in the future." Accordingly, L'Enfant recovered all to which it was entitled upon sale of the West Building.

*Interest*

In light of the conclusion that plaintiff is not entitled to recover for lost profits, the parties' arguments about interest on them need not be addressed. However, the same considerations attend the question of whether plaintiff is entitled to interest on the carrying charges awarded.

■ "Interest on a claim against the United States shall be allowed in a judgment of the United States Claims Court only under a contract or an act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516(a). The term "all damages" in the contract must be strictly construed because it involves a limited waiver of sovereign immunity. *See, e.g., Aetna Casualty & Surety Co. v. United States,* 228 Ct.Cl. 146, 151, 655 F.2d 1047, 1051 (1981). An express provision must be more specific than "all damages" to operate as a waiver of immunity by the United States. *See United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585, 590, 67 S.Ct. 398, 400, 91 L.Ed. 521 (1947); *Ramsey v. United States,* 121 Ct.Cl. at 432, 101 F.Supp. at 356. Because neither the contract nor any statute explicitly provides for L'Enfant to recover interest, it is precluded from recovering it in damages. *Id. See also United States v. New York Rayon Co.,* 329 U.S. 654, 659, 67 S.Ct. 601, 603, 91 L.Ed. 577 (1947).

■ Plaintiff attempts to avoid the effect of sovereign immunity by claiming the Lease agreement should not be interpreted under federal law, but in accordance with the law of the District of Columbia which permits interest against the sovereign. The law of the situs of the contract is relevant, however, only if an underlying state property interest is involved. *See Pinewood Realty Ltd. v. United States,* 223 Ct.Cl. 98, 102, 617 F.2d 211, 213 (1980). This case does not concern any underlying property interest, only the rights of the parties under a government contract which are governed by uniform federal law. *Id.*

■ As a final alternative basis for recovering interest, L'Enfant argues that because this contract was made with RLA, which was established as a separate corporate entity with the power to sue and be sued, an award of interest against it, even though a federal instrumentality, is permis-

sible. Plaintiff's argument ignores that its claim against RLA is a claim against the United States. *Coley Properties Corp. v. United States,* 219 Ct.Cl. 227, 239, 593 F.2d 380, 387 (1979). "[I]t is well settled that an agency's 'sue and be sued' clause does not nullify the concurrent liability of the United States as a principal." *Butz Engineering Corp. v. United States,* 204 Ct.Cl. 561, 573, 499 F.2d 619, 625 (1974). This court cannot enter a judgment for interest or any other damages against RLA, only against the United States, Federal Courts Improvement Act of 1982 § 133(a), Pub.L. No. 97–164, 96 Stat. 39 (to be codified in 28 U.S.C. § 1491(a)(1)), and has no authority to award interest in a suit against the United States absent an express statutory or contractual provision. *Coley Properties Corp.,* 219 Ct.Cl. at 239, 593 F.2d at 386.

■ In a slightly different vein, during trial defendant conceded its liability for lost earnings on equity plaintiff had invested but could not have deferred during the period of delay. This amounted to $309,586 which it could have made on that money had it not been tied up in the project. After trial, however, defendant withdrew its concession saying this kind of award is also prohibited by 28 U.S.C. § 2615(a). As opposed to the stipulation of fact from which defendant unsuccessfully sought to withdraw, *see* note 2, *supra,* if viewed as a stipulation at all, this is an attempt to stipulate an issue of law which usurps the court's function and may be disregarded. *See Hegman-Harris Co. v. United States,* 194 Ct.Cl. 574, 581, 440 F.2d 1009, 1012 (1971).

The Court of Claims rejected the proposition that the Tucker Act allows compensation, either as imputed interest or additional profit, for the use of plaintiff's equity capital, and held that 28 U.S.C. § 2615(a) prohibits this kind of award. *See Fishbach & Moore International Corp. v. United States,* 223 Ct.Cl. 119, 130, 617 F.2d 223, 228 (1980); *Dravo Corp. v. United States,* 219 Ct.Cl. 416, 425, 430, 594 F.2d 842, 846, 849 (1979); *Framlau v. United States,* 215 Ct.Cl. 185, 197, 568 F.2d 687, 693 (1977). Therefore, defendant's erstwhile concession notwithstanding, the court cannot award this as an element of damages, either.

*Increased Construction and Financing Costs*

■ As a third element of special damages, L'Enfant seeks nearly $2 million in increased construction and financing costs. Defendant has stipulated to the amount of the increased costs, but opposes recovery on the grounds that they were recovered by L'Enfant when it sold the building.

L'Enfant has not cited any case in which the owner of a building recovered increased interest and materials costs because commencement of construction of that building was delayed. All but one of the cases it cited concern contractors operating under fixed price construction contracts with no ownership interest.[3] In the other case, *New Amsterdam Casualty Co. v. Mitchell,* 325 F.2d 474 (5th Cir.1964), a developer was awarded additional interest it paid on a construction loan as a result of a delay during construction, but that action was against a surety for a defaulting contractor. It involved residential properties which

---

3. *Cornell Co. v. Ceramic Coating Co.,* 626 F.2d 990 (D.C.Cir.1980) (judgment for contractor against manufacturer of defective pipe for increased labor and equipment costs resulting from repair of work with defective pipe); *General Insurance Co. of America v. Hercules Construction Co.,* 385 F.2d 13 (8th Cir.1967) (judgment for general contractor against subcontractor surety for extra labor and equipment costs incurred in accelerating pace of construction in attempt to complete project on time despite subcontractor's delay in furnishing concrete); *S.S. Silberblatt, Inc. v. United States,* 228 Ct.Cl. 729 (1981) (judgment for contractor for extra interest paid on existing loans as a direct result of government's delay); *Bell v. United States,* 186 Ct.Cl. 189, 404 F.2d 975 (1968) (judgment for contractor for increased interest costs resulting from deceleration in production due to "change order"); *Dale Construction Co. v. United States,* 161 Ct.Cl. 825 (1963) (judgment for contractor for costs of materials purchased to perform contract on which United States never gave notice to proceed); *Brand Investment Co. v. United States,* 101 Ct.Cl. 665, 58 F.Supp. 749 (1944) (judgment for contractor for overhead and equipment costs during period of unjustified stop work order).

were sold at the same price as before the delay, thereby preventing the developer from recouping his loss.

In our case, there was no increase in interest costs due to delay during construction. Rather, L'Enfant obtained construction financing at one percent above the prime at a time when the prime rate was higher than it had been 15 months earlier. L'Enfant is implicitly asking the court to assume that it would have obtained identical financing terms 15 months earlier. No evidence was presented to support that assumption.

It was not stipulated that L'Enfant would have received the same financing 15 months earlier, only that the total amount of interest was higher due to the floating prime rate than if the same loan had commenced 15 months earlier. In *S.S. Silberblatt v. United States,* 228 Ct.Cl. 729, 731 (1981), the Court of Claims said that a contractor was entitled to recover extra interest "incurred on existing loans as a direct result of the government's delay." Here, there was no existing loan at the time of the delay. On the evidence presented at trial, there is no way for the court to know what rate of interest L'Enfant would have paid if it had obtained construction financing 15 months earlier.

L'Enfant also has not shown that it suffered any damage with respect to increased material costs. Increased costs for construction cannot be attributed to idle equipment or standby personnel due to delay, as in the cases cited by L'Enfant, *see* n. 3, *supra,* but to fluctuations in market prices. During a period of inflation nearly all prices increase, including rental rates for office buildings and real estate sales prices. Otherwise, there would be no new construction during those periods. A new building which comes on the market during a period of inflation will be able to charge higher rental rates than a building which came on earlier. Had L'Enfant retained the building, it would have been able to charge higher rates over the useful life of the building than if the West Building had been constructed earlier and thereby recoup costs

increased by inflation. Instead, it sold the building to the United States Postal Service and recouped the costs that way. L'Enfant's own expert said that the sales price of a commercial office building reflects its future potential for income. The higher rental rates the West Building could obtain by coming on the market 15 months later were reflected in its sale price. L'Enfant has not proven any damages from increased costs of interest or inflation.

*Attorney's Fees*

The last element of special damages sought is attorney's fees. Plaintiff argues once again that the Lease provision for recovery of "all damages and costs" covers them. Defendant responds that attorney's fees, like interest, are not recoverable except where expressly allowed by contract or statute.

Defendant is correct. Subject only to a narrow exception derived from equitable powers of a court to award attorney's fees for willful disobedience of a court order or when a party acts in bad faith, *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975), absent specific statutory authority or an express contractual commitment, attorney's fees may not be recovered in federal litigation. *Id.* at 265–68, 95 S.Ct. at 1626; *Kania v. United States,* 227 Ct.Cl. 458, 466, 650 F.2d 264, 269 (1981); *National Association of Letter Carriers v. U.S. Postal Service,* 590 F.2d 1171, 1174 (D.C.Cir.1978). Use of the term "all damages" does not serve as an express waiver of sovereign immunity and a general waiver of sovereign immunity does not reach attorney's fees unless Congress clearly says so. *National Association of Letter Carriers,* 590 F.2d at 1180.

Characterizing counsel fees as contract damages does not overcome this prohibition. *Kania v. United States,* 227 Ct.Cl. at 467, 650 F.2d at 269. At best, they would be consequential damages which are not normally awarded for breach of contract. *Id.; see also Ramsey v. United States,* 121 Ct.Cl. at 433, 101 F.Supp. at 357.

## CONCLUSION

Accordingly, it is ORDERED that judgment be entered in favor of plaintiff in the amount of $109,593.75. Plaintiff will also have its costs.