# United States Court of Appeals for the Federal Circuit

---

**ENERGY NORTHWEST,**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2010-5112

---

Appeal from the United States Court of Federal Claims in case no. 04-CV-010, Judge Edward J. Damich.

---

Decided: April 7, 2011

---

NORMAN M. HIRSCH, Jenner & Block, LLP, of Chicago, Illinois, argued for plaintiff-appellee. With him on the brief were WILLIAM D. HEINZ, DAVID JIMÉNEZ-EKMAN, CHRISTOPHER TOMPKINS and APRIL A. OTTERBERG.

HAROLD D. LESTER, JR, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and SHARON A. SNYDER, Trial Attorney. Of counsel on the

brief were ALAN J. LO RE, Assistant Director, SCOTT R. DAMELIN, Trial Attorney; and JANE K. TAYLOR, Office of General Counsel, United States Department of Energy, of Washington, DC.

_____

Before LOURIE, BRYSON, and PROST, *Circuit Judges*.

PROST, *Circuit Judge*.

The government appeals three categories of damages awarded by the United States Court of Federal Claims for the government's breach of its commitment to dispose of Plaintiff's spent nuclear fuel. The contested categories are as follows: First, the trial court awarded Plaintiff the cost of certain site modifications that the government contended were not proved to have been caused by the breach. Second, the court awarded damages to account for certain indirect overhead expenses that accompanied Plaintiff's mitigation activities, though Plaintiff did not offer proof that the mitigation actually caused specific categories of these indirect overhead expenses to increase. Third, the court awarded Plaintiff the cost of interest payments made in connection with Plaintiff's financing of its mitigation activities. *Energy Nw. v. United States*, 91 Fed. Cl. 531 (2010).

We hold that the Court of Federal Claims erred by failing to require Plaintiff to prove that its site modifications were actually caused by the government's breach. We hold that the court was correct in its treatment of Plaintiff's indirect overhead expenses. And we hold that, because the government did not waive its sovereign immunity against the recovery of interest, the court erred in awarding Plaintiff recovery of its interest costs. We therefore vacate the Court of Federal Claims' judgment as to the site modifications, affirm as to the

indirect overhead expenses, reverse as to the interest recovery, and remand.

I

A

This is a spent nuclear fuel case. In 1982, Congress instructed the Department of Energy ("DOE") to prepare a plan for a permanent repository of spent nuclear fuel ("SNF") and other high-level radioactive waste ("HLW") produced as part of commercial nuclear power generation. *See* Nuclear Waste Policy Act of 1982 § 111 [hereinafter NWPA], 42 U.S.C. § 10131. As part of its plan for a national nuclear waste disposal strategy, Congress authorized the Secretary of Energy to contract with the nuclear utilities. For our purposes, the bargain was this: The utilities would pay fees into a Nuclear Waste Fund that the government set up under the NWPA. In return, the DOE committed to begin accepting and disposing of contract holders' SNF no later than January 31, 1998. NWPA § 302, 42 U.S.C. § 10222.

In early 1983, as set forth in the NWPA, the DOE promulgated regulations defining the text of its standard contract with the nuclear utilities. Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 10 C.F.R. § 961.11 (1983) [hereinafter Standard Contract]. The contract reflected the basic bargain described above, but of course included many terms defining the parties' various obligations. Notably, the contract provided that while the DOE would ultimately accept title to the utilities' SNF, each utility had responsibility for preparing and loading the SNF for transportation:

2. *Preparation for Transportation*

> (a) The Purchaser [i.e., the utility] shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility.

*Id.* sec. IV.A.2. Such arrangements were to be made in accordance with the DOE's selection of a storage cask technology for indefinitely storing the SNF:

> 2. DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility. Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such cask(s) shall be suitable for use at the Purchaser's site, meet applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to, the following:
>
> (a) written procedures for cask handling and loading, including specifications on Purchaser-furnished canisters for containment of failed fuel;
>
> (b) training for Purchaser's personnel in cask handling and loading, as may be necessary;
>
> (c) technical information, special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s); and

> (d) sufficient documentation on the equipment supplied by DOE.

*Id.* sec. IV.B.2.

In June 1983, the DOE executed the Standard Contract with Plaintiff Energy Northwest (then known as the Washington Public Power Supply System). Energy Northwest is a municipal corporation and joint operating agency of the State of Washington. It began commercial operations at its Columbia nuclear power plant in Richmond, Washington, in December 1984.

Time passed. As the Columbia plant generated SNF, Energy Northwest put it in a wet storage pool located on-site. The wet storage pool had a limited capacity for SNF, based on the pool's dimensions and the "racking" technique employed. By the early 1990s, Energy Northwest projected that the pool would reach capacity some time after 2003 if SNF were not removed.

Had the DOE timely begun accepting SNF for disposal in 1998, this might not have been a problem. With some modifications to the wet pool, such as building additional storage racks in empty areas, the Columbia plant would have had sufficient SNF storage capacity to keep operating so long as SNF was leaving the pool and being accepted by the DOE at the agreed-upon rates. But as far back as the late 1980s there were indications that the DOE's timely performance was unlikely. In May 1994, these indications became manifest. The DOE announced that it would not be able to begin accepting SNF from Energy Northwest (or any other utilities) by the agreed date of January 1998. Notice of Inquiry: Waste Acceptance Issues, 59 Fed. Reg. 27,007 (May 25, 1994). The DOE informed the utilities that the earliest it could begin accepting SNF was 2010. *Id.* at 27,008.

Energy Northwest faced a challenge. If it did not take some action to expand the Columbia plant's SNF storage capacity, around 2003 the Columbia wet pool would fill up and the plant would have to close. But neither did Energy Northwest know exactly when—if ever—the DOE would begin accepting SNF for final disposal. Energy Northwest concluded that building its own solution for indefinitely storing SNF was preferable to running the risk that the DOE would not perform in time to prevent the wet storage pool from filling up.[1]

It therefore decided to build an Independent Spent Fuel Storage Installation ("ISFSI") where the Columbia plant's SNF could be stored indefinitely in dry casks.[2] In 1999, Energy Northwest entered into a contract for design and construction of such a system. Work began in 2000, and in September 2002 the Columbia plant's ISFSI was approved to store SNF.

B

Development of the ISFSI was, of course, a large project for Energy Northwest. It estimated total costs around $60 million. Three cost categories (as computed by Energy Northwest) are relevant to this appeal.

---

[1] Energy Northwest could have "re-racked" its wet storage pool to eke out some additional SNF storage, possibly enough for ten to twelve years' additional capacity. Its decision to build instead an indefinite-term storage solution was held reasonable below and was not appealed.

[2] In the dry cask system Energy Northwest selected, SNF assemblies are placed in a stainless steel canister, which is then embedded in a concrete overpack. The casks are then stored at a dedicated installation (the ISFSI).

*Modification costs.* In order to get SNF safely out of the wet pool and into dry storage casks, Energy Northwest made modifications to the Columbia plant. These included:

> [A] seismic mitigation device in the cask wash down area, the fabrication and installation of seismic restraints in the cask loading pit, removal and rework of the cask wash down pit grating and modification of the cask wash down pit drain and piping, haul path and transfer pad from the reactor building to an on-site railroad line, preparation or modification of procedures for cask loading, and an underwater camera.

*Energy Nw.*, 91 Fed. Cl. at 552. Energy Northwest estimated that these modifications cumulatively cost about $1 million.

*Indirect overhead costs.* Energy Northwest estimated that about $2.9 million of its "overhead" costs were assignable to the ISFSI project. For accounting purposes Energy Northwest treats its administrative, management, information services, and resource development expenses as overhead costs that are not specifically charged to any project. The $2.9 million figure is derived by computing the fraction of Energy Northwest's total available labor that was spent on the ISFSI project, and applying that fraction to the overhead pool.

*Financing costs.* In May 2002, Energy Northwest took a $34 million advance against a credit agreement with Citibank in order to raise capital for the ISFSI project. In 2003, it issued $46 million in utility bonds, using much of the proceeds to repay the advance, address additional

costs of the ISFSI, and cover some costs of the bond issue itself. Energy Northwest estimated that this financing cost about $6 million in interest charges, which Energy Northwest paid to Citibank and to the bond holders.

C

On January 7, 2004, Energy Northwest sued the government in the Court of Federal Claims for breach of contract. Two years later, the court entered summary judgment of the government's liability, and the case proceeded to a bench trial on damages. *Energy Nw. v. United States*, 69 Fed. Cl. 500 (2006).

On February 26, 2010, the court awarded Energy Northwest $56.9 million in damages. *Energy Nw.*, 91 Fed. Cl. at 560. Analyzing the case as one of partial breach, the court awarded Energy Northwest certain costs associated with its construction of the Columbia ISFSI. The award included about $1 million for the site modifications, $2.9 million for indirect overhead costs, and $6 million for the interest charges Energy Northwest paid.

The government timely appealed the judgment as to these three categories of award. It did not appeal the remainder of the award, about $47 million.

II

A. Standard of Review

We have jurisdiction over this appeal from a final judgment of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3). We review that court's judgments to determine if they are incorrect as a matter of law or

premised on clearly erroneous factual determinations. *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1171 (Fed. Cir. 1991). We review that court's legal determinations de novo. *Dehne v. United States*, 970 F.2d 890, 892 (Fed. Cir. 1992).

### B. The Court of Federal Claims Erred in Its Causation Analysis Concerning the Site Modifications

We turn first to the site modifications Energy Northwest made to adapt the Columbia plant to the new ISFSI. The issue on appeal is the legal rule for proving causation in a damages award.

### 1

The parties do not at this stage dispute the judgment that the government's breach caused Energy Northwest to build the Columbia ISFSI. But as the government points out, a plaintiff seeking damages must submit a hypothetical model establishing what its costs would have been in the absence of breach. *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001). It is only by comparing this hypothetical "but-for" scenario with the parties' actual conduct that a court can determine what costs were actually caused by the breach, as opposed to costs that would have been incurred anyway. *Id.*; *see also Yankee Atomic Electric Co. v. United States*, 536 F.3d 1268, 1273 (Fed. Cir. 2003).

The government contends that Energy Northwest failed to meet this burden as to the Columbia plant modifications, which the government views as Energy Northwest's contractual responsibility under the Standard Contract. *See* Standard Contract sec. IV.A.2.(a) (requiring Energy Northwest to "arrange for, and provide,

all preparation, packaging, required inspections, and loading activities" necessary to convey the SNF to the DOE). Citing *Yankee Atomic*, the government claims that Energy Northwest can recover its modification costs if and only if it can prove that the modifications actually made differ from those that were already required by the contract. According to the government, Energy Northwest should have presented the court with a hypothetical scenario that modeled the costs of site modifications necessary at the Columbia plant in the "but for" world (i.e., in the world where the government did not breach), and then compared the hypothetical scenario with the costs actually incurred.

Energy Northwest takes a different view of how its plant modifications fit into this case. According to Energy Northwest, the issue is not whether the modification costs would have been incurred in a hypothetical non-breach world, but whether they will be incurred again in the future, when the DOE ultimately performs and begins accepting the Columbia plant's SNF. Energy Northwest cites as support *Carolina Power & Light Co. v. United States*, 573 F.3d 1271, 1277 (Fed. Cir. 2009). Energy Northwest, like the trial court, interprets the government's position as a request for a damages offset due to avoided future costs. Energy Northwest posits that if the government wants an offset, the burden is the government's to prove that costs have actually been avoided—and not merely deferred. *See id.*

2

The parties therefore present two views of this issue, each controlled by a prior precedential decision of this court. But which, if either, controls this appeal? A brief summary is instructive.

In *Yankee Atomic*, the plaintiff utility obtained a hefty damages award from the government for failure to timely accept the utility's SNF.  536 F.3d at 1272.  This court vacated the portion of the award reimbursing certain costs incurred after the breach and remanded.  *Id.* at 1274.  The problem was that the trial court's opinion failed to consider that even in the "but for" world, the utility would likely have borne some costs for SNF storage.  Assuming the government had not breached, neither would it have immediately accepted all the utility's SNF, so there would have been some interim storage costs.  It was thus improper to award the utility all its post-breach costs, because only some of those costs were actually caused by the breach (i.e., the costs associated with storing SNF that the government should have accepted).  Because the record included no way to separate the costs actually caused by the breach from those that the utility would have borne anyway, the court remanded for further development.  *Id.* at 1273–74.

*Carolina Power* presents a separate, if superficially similar, issue.  The government there urged this court to reduce an $83 million damages award by $10 million based on the government's estimate that, had the government timely begun accepting the utility's SNF, the utility would have had to spend $10 million processing and loading its SNF into casks for transportation to the government.  573 F.3d at 1277.

This court rejected the request for such an "offset," pointing out, "Plaintiffs have not avoided the costs of loading.  Rather, they have merely deferred these costs." *Id.*  The underlying logic was that the court would not draw premature conclusions about what the utilities' future loading costs might or might not be.  It was impossible to award the government its full requested

offset without concluding that the utilities' future loading costs would be zero. This court declined to so speculate: "Just as the utilities cannot now collect damages not yet incurred under the ongoing contract, the government cannot prematurely claim a payment that has not become due."[3] *Id.* (quoting *Yankee Atomic*, 536 F.3d at 1281).

These cases address separate aspects of the damages analysis. *Yankee Atomic* shows the importance of proving causation by comparing a hypothetical "but for" world to a plaintiff's actual costs. 536 F.3d at 1273–74. Under its rule, a plaintiff must prove the extent to which his incurred costs differ from the costs he would have incurred in the non-breach world. *Carolina Power* addresses the separate circumstance where a breaching party seeks to offset an award by proving that the non-breaching party has achieved some cost savings because the breach permitted it to avoid—not just defer—some aspect of performance. *Carolina Power* properly urges caution when speculating about the future in a case of partial breach—usually, the proper approach is to wait for those events to actually occur, and to resist premature conclusions. 573 F.3d at 1277.

3

Having assessed the precedent, we conclude that the trial court did not properly apply *Yankee Atomic* to its analysis of the Columbia plant modifications. Energy

---

[3] This skepticism about reaching into the future is consistent with our prior holdings. *See Ind. Mich. Power v. United States*, 422 F.3d 1369, 1376 (Fed. Cir. 2005) (declining to award damages for anticipated future non-performance); *Yankee Atomic*, 536 F.3d at 1281 (declining to award a damages offset to account for an anticipated future payment).

Northwest is entitled to recover the cost of those modifications only to the extent it can prove, to a reasonable certainty, that but for the government's breach they would not have been incurred.[4] *Ind. Mich. Power*, 422 F.3d at 1373; *Yankee Atomic*, 536 F.3d at 1273. But the trial court's opinion analyzes the plant modifications only under the avoided-costs standard of *Carolina Power*. *Energy Nw.*, 91 Fed. Cl. at 552–53. This was improper. Before considering any offsets to the award, the trial court had an obligation to first establish that the entire awarded damages were actually caused by the breach.

Energy Northwest defends the trial court's approach. First, it argues that Energy Northwest carried the burden required by *Yankee Atomic* to prove causation with regard to the Columbia site modifications. Appellee Br. 27–28. It notes that the trial court held (and the government does not appeal) that the building of the ISFSI was a reasonable and foreseeable response to the government's breach. *Id.* at 18. While that is true, it does not change Energy Northwest's obligation to prove the recoverable costs associated with that construction. If a cost would have been incurred even in the non-breach world, it is not recoverable. *Ind. Mich. Power*, 422 F.3d at 1373; *Yankee Atomic*, 536 F.3d at 1273. Here, the government has argued that Energy Northwest's claimed damages improperly seek recovery of modification costs not caused by the breach. As the party with the burden of proof, Energy Northwest's obligation is to prove that it is not seeking to recover any improper costs.

---

[4]    The trial court here adopted the "but for" causation test, which this court has approved for use in cases of this type. *Energy Nw.*, 91 Fed. Cl. at 541 (citing *Yankee Atomic*, 536 F.3d at 1272–73).

Energy Northwest next contends that it carried its burden as to the modifications by presenting testimony that there is a "90% likelihood" Energy Northwest will have to re-modify the Columbia plant when the DOE eventually performs and begins accepting SNF. Appellee Br. at 27; *see also Energy Nw.*, 91 Fed. Cl. at 553. Energy Northwest argues that the government failed to sufficiently rebut this "90%" testimony. The Court of Federal Claims, however, applied the wrong test to this case in evaluating the evidence presented. On remand it can reweigh the evidence, including the "90%" opinion of Energy Northwest's expert, to determine whether Energy Northwest's burden was carried.

Energy Northwest also argues that there is uncertainty about what the non-breach world modification costs would have been, and that the government is responsible for this uncertainty. Appellee Br. 28–29. It points out that the non-breach world modification costs would have depended on the storage system selected by the DOE. Part of the breach was the DOE's failure to select such a system. Energy Northwest therefore argues that the burden of proof should have shifted to the government.

Though Energy Northwest frames this argument in discussion of the future world, it is worth considering whether the government somehow constrained Energy Northwest from carrying its burden under *Yankee Atomic*. On the record before us we do not see any evidence that the government somehow obstructed Energy Northwest from presenting, on the available evidence, its best possible model of what the DOE would have done absent breach. The discovery process affords litigants the opportunity to learn even confidential details of what each other knew, or planned, or what was technically

possible, at various points in time. The opinions of experts can be leveraged to fill gaps. Should one party unjustifiably fail to participate in discovery, trial courts have a variety of remedial measures available, up to and including the resolution of fact issues against the non-participating party. On the record before us we are unable to say that Energy Northwest faced any improper hindrance in its ability to assemble the proof required by *Yankee Atomic*. We therefore see no reason why the burden of proving the non-breach world—as to the plant modifications—should not lie with Energy Northwest.[5]

Finally, Energy Northwest argues that the Standard Contract actually required Energy Northwest to make no modifications at all because it bound the DOE to choose

---

[5]   This court's recent opinion in *Southern Nuclear Operating Co. v. United States*, No. 2008-5020, slip op. at 12–13, 2011 WL 832912 (Fed. Cir. Mar. 11, 2011), is consistent. There, this court noted that a defendant may seek to offset a damages award due to avoided costs (i.e., non-breach-world costs that the plaintiff avoided because of the breach). While the burden of proof for causation remains squarely with the plaintiff, a defendant seeking an offset has an obligation to "move forward by pointing out the costs it believes the plaintiff avoided because of its breach," or risk having the issue both determined against it and waived on appeal. *Id*. at 13. Once the defendant has properly articulated an offset, "the burden shift[s] to the plaintiff to incorporate those saved costs into its formulation of a plausible but-for world." *Id*. at 14.

As discussed *supra*, however, this appeal does not concern a defendant seeking an offset due to avoided costs, but a defendant arguing that certain awarded damages were not caused by the breach in the first place. *Yankee Atomic* is clear—and *Southern Nuclear* is not inconsistent—that the burden to prove causation is the plaintiff's.

an SNF cask "suitable for use" at Energy Northwest's facility. Appellee Br. at 30–31 (quoting Standard Contract sec. IV.B.2). If anything, this argument highlights why the trial court should have required Energy Northwest to prove causation as to the plant modifications under *Yankee Atomic*. That inquiry would have set up for the parties and the court the necessary investigation into precisely what would have been done absent breach. As we are remanding, we decline Energy Northwest's invitation to interpret this aspect of the Standard Contract at this time.

Because the trial court should have required Energy Northwest to prove that the Columbia site modifications would not have been necessary but for the government's breach, we vacate the award of damages associated with those modifications. We remand for further proceedings to analyze the trial evidence under the correct standard.

## C. There Was No Error in Awarding Damages for Indirect Overhead Expenses

The next issue is whether the trial court committed legal error in awarding Energy Northwest $2 million in compensation for certain indirect overhead expenses. The government argues that these costs were improperly awarded because Energy Northwest did not offer proof that its overhead costs actually increased as a result of the breach. The government again cites *Yankee Atomic* and contends that Energy Northwest should have been required to prove what its indirect overhead costs would have been in the absence of the breach. Appellant Br. 21–22. The government would then limit Energy Northwest's recovery to overhead costs actually shown to have increased over the non-breach world.

Energy Northwest argues that the award of damages for overhead costs is a factual question of the damages amount, not a legal question of causation. Appellee Br. 32 (citing *Carolina Power*, 573 F. 3d at 1276). It notes that the larger question of whether the breach caused Energy Northwest to build the ISFSI, having been resolved in Energy Northwest's favor below, is not on appeal here. As such, Energy Northwest contends that the only question is whether the trial court committed clear error in the amount of the award.

Energy Northwest is correct. A plaintiff is entitled to recover costs that were caused by the defendant's breach. The plaintiff may prove the amount of costs by whatever means available, so long as the cumulative result is a reasonable certainty that the awarded costs were actually caused by the breach. *Ind. Mich. Power*, 422 F.3d at 1373.

Here, it is undisputed that Energy Northwest undertook a variety of mitigation activities because of the government's breach, including construction of an ISFSI. We find nothing objectionable in Energy Northwest's argument that its mitigation activities generally were supported by certain overhead services that Energy Northwest provided for the benefit of all its operations (not only its mitigation activities). Energy Northwest did not argue that the entire cost of these overhead services was recoverable as damages. Instead, it presented testimony estimating the portion of its overhead costs fairly allocated to support of the mitigation via generally accepted accounting practices, and sought to recover that portion. Energy Northwest's allocation was "based on labor, measured by time, that is spent on [mitigation]." *Energy Nw.*, 91 Fed. Cl. at 553. The trial court accepted

this allocation as creating a reasonable certainty as to causation, and we find no legal error in that acceptance.

This holding is consistent with *Yankee Atomic*. The government is apparently resigned to the award of Energy Northwest's direct labor costs, and so does not contest that that work (and the direct cost of it) was actually caused by the breach. But it seeks a different outcome for the indirect costs of supporting that same work. We do not see any such requirement in *Yankee Atomic*. That case requires a plaintiff to show what it would have done in the non-breach world, and what it did post-breach. *Yankee Atomic*, 336 F.3d at 1273–74. Once a plaintiff has proved that certain work was undertaken because of the breach (i.e., it would not have been undertaken in the non-breach world), he is entitled to prove the amount of the associated cost (including both direct and indirect costs) by whatever reasonable techniques are available.

The government also cites *Carolina Power*, but that case is similarly unavailing. There, as here, the plaintiff allocated a portion of its overhead expenses to mitigation projects. *Carolina Power*, 573 F.3d at 1276–77. Both the trial court and this court reviewed the allocation and found it proper. This court noted that its holding was supported by the fact that had the utility not allocated part of its overhead to the mitigation, "other activities would have assumed a disproportionate amount of the total overhead," *id.* at 1277, but contrary to the government's theory that circumstance was neither necessary nor dispositive. "Determining the amount of damages to award is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of a district court." *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*,

350 F.3d 1327, 1345 (Fed. Cir. 2003) (quotation marks omitted). That the *Carolina Power* case presented an apparently undisputed fact that failure to allocate for mitigation would have distorted the plaintiff's overall accounting does not mean such a fact must be presented in all cases. So long as the plaintiff can present a sufficient basis for making the trial court reasonably certain that the claimed damages were caused by the breach, whatever the proof method, we will defer to that finding in the absence of clear error. *See also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 834 (Fed. Cir. 2010) (emphasizing requirement that recoverable costs must be "directly related" to the contract and a "direct result" of the breach, but not limiting litigants' method of proof).

### D. Energy Northwest Cannot Recover Interest

Finally, the government seeks reversal of $6 million in damages attributable to interest Energy Northwest paid on its bond issue and its credit agreement with Citibank. The government claims sovereign immunity against liability for interest, including interest on funds borrowed in order to mitigate the government's breach. *Library of Cong. v. Shaw*, 478 U.S. 310, 314 (1986). Such immunity, according to the government, must be explicitly waived before interest can be awarded. The government finds no waiver in the statutes or the Standard Contract, and thus no liability for interest. The relevant statute reads:

2516. Interest on claims and judgments

(a) Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a

contract or Act of Congress expressly providing for payment thereof.

28 U.S.C. § 2516(a). The government also argues that this court's precedent bars recovery of interest paid on funds "borrowed as a result of the government's breach." *England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372, 1379 (Fed. Cir. 2004).

Energy Northwest contends that the immunity against interest limits only interest "on" a claim (e.g., awards of prejudgment interest), and not interest "as" a claim (e.g., Energy Northwest's financing costs incurred as part of mitigation). Appellee Br. 42. The government disagrees, arguing that there is no caselaw support for differential treatment between interest "on" a claim and interest "as" a claim. Appellant Br. 45.

Both parties acknowledge that this court has, on occasion, held the government liable for interest. The main case is *Bell v. United States*, 404 F.2d 975, 984 (Ct. Cl. 1968). *See also Contel Advanced*, 384 F.3d at 1379 (discussing *Bell*); *J.D. Hedin Constr. Co. v. United States*, 456 F.2d 1315, 1330 (Ct. Cl. 1972) (same).

*Bell* involved an Army procurement contract that included a standard clause, called a "Changes" clause, authorizing judicial adjustment of the contract terms to account for unilateral changes the government might make to the contractor's obligation. *See Bell*, 404 F.2d at 976. The clause read as follows:

The Contracting Officer may at any time, by a written order, and without notice to the sureties make changes of any one or more of the following types:

[list of change types] . . . .

If such changes cause an increase or decrease in the amount of work under this contract or in the cost of performance of this contract or in the time required for its performance *an equitable adjustment shall be made . . . .*

*Id.* at 976–77 (quoting "Changes" clause) (emphasis added). Following a number of "Change Orders" from the government unilaterally modifying the contractor's obligation, the contractor in *Bell* sought to recover certain interest costs undertaken in order to meet the changed requirements. This court's predecessor held that such costs were recoverable. *Id.* at 984. It reasoned that the "Changes" clause contemplated the award of interest costs to compensate a contractor for changes to the contract; this constituted government consent to the award of interest. *Id.*

*Bell* spawned a host of other "equitable adjustment" cases, some of which (like *Bell*) consented to the award of interest costs. And as in *Bell*, the underlying reason for the interest award was the government's consent to liability for interest, indicated by the inclusion of the "Changes" clause. When litigants have brought claims for interest unsupported by such a clause, or some other express waiver of immunity, this court has consistently held the government immune from recovery of interest.[6]

---

[6] Briefing and argument in this appeal suggested another category of cases where this court held the government liable for interest without an express waiver of immunity. *Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) [hereinafter *Bluebonnet III*], was a *Winstar*-type case. *See generally United States v. Winstar Corp.*, 518 U.S. 839, 843–58 (1996). Both Energy Northwest and the government read

*Bluebonnet III* as consenting to government liability for interest without an express contractual or statutory waiver. We do not share that view. While the plaintiffs in *Bluebonnet III* sought to recover the increased interest costs they experienced due to the government's breach, both this court and the Court of Federal Claims rejected that claim for inadequate proof as to the amount. 266 F.3d at 1358 (rejecting Bluebonnet's claim for "non-EBA damages"). This court obliquely noted that the Court of Federal Claims had also rejected those damages under *Shaw*, but this court did not take up the sovereign immunity question. *Id.* ("We need not address and express no opinion on the court's alternative grounds for denying an award of non-EBA damages.").

This court did reverse the Court of Federal Claims' denial of a *separate* class of damages—the costs associated with plaintiffs' execution of a certain "Economic Benefits Agreement." *Id.* Plaintiffs sought to recover money paid out under that agreement, namely, a 49% share in the profits of plaintiffs' holding company. *Bluebonnet Sav. Bank, FSB v. United States*, 47 Fed. Cl. 156, 181–82 (2000), *rev'd*, 266 F.3d 1348 (2001); *see also Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1343 (Fed. Cir. 2003). While the conveyance of these profit shares was a "financing cost" of a sort, neither this court nor the Court of Federal Claims treated it as an award of interest. This court's reversal and remand as to those shares should not be interpreted as a departure from *Shaw*.

We note further that the *Winstar* cases (of which *Bluebonnet III* is an example) presented a dramatically different picture than this appeal. There, the essence of the contractual relationship was the government's desire to promote acquisition of failing thrifts that were not economically viable without various government guarantees. The government's breach, and the complex financial results, present a dramatically different picture than the situation at bar. Thus, even if *Bluebonnet III* had awarded interest, it would not control this appeal.

*See, e.g., Contel Advanced*, 384 F.3d at 1379; *J.D. Hedin Constr.*, 456 F.2d at 1330.

Energy Northwest, however, does not contend that the Standard Contract here has any sort of "Changes" clause, and points to no other express waiver of immunity against recovery of interest. Nevertheless, it believes the trial court was correct to award it its interest costs. It argues that there exists a class of case in which interest can be awarded, even without express waiver, so long as the interest costs are directly traceable to the government's breach. It cites as support *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994).

In *Wickham Contracting*, a plaintiff attempted to recover interest payments it had made in order to finance performance under a government contract. There is no express mention of a "Changes" clause in the opinion. This court denied plaintiff's claim for lack of proof, but noted:

> Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract. *Gevyn Constr. Corp. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987) ("[28 U.S.C. §] 2516(a) does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment.").

*Id.* at 1582–83 (citation expanded).

Energy Northwest, like the trial court, concludes that *Wickham Contracting* thus holds that a plaintiff whose contract lacks any "Changes" clause may nevertheless recover interest "as" a claim if "its financing costs were directly traceable to the Government's breach." Appellee Br. 44.

Energy Northwest is reading too much into *Wickham Contracting*. As the quoted matter shows, that case's pronouncement that "a contractor may recover interest actually paid on funds borrowed" was limited to the context of an "equitable adjustment." *Wickham Contracting*, 12 F.3d at 1582–83. The term "equitable adjustment" had specific meaning in government contracting cases denoting the presence of a "Changes" clause. *See Bell*, 404 F.2d at 976–77 (quoting "Changes" clause's specific invocation of an "equitable adjustment"). Although *Wickham Contracting* does not expressly describe such a clause, the core issue in that case was the application of an "equitable adjustment" for numerous delays unilaterally imposed by the General Services Administration ("GSA"). 12 F.3d at 1575. The opinion repeatedly refers to "the *Eichleay* formula"—a formula used in computing equitable adjustments under a "Changes" clause. *Id.* at 1575–76; *see also Sauer Inc. v. Danzig*, 224 F.3d 1340, 1347 (Fed. Cir. 2000) (discussing use of *Eichleay* formula for equitable adjustments occasioned by a "Changes" clause). And the Board opinion underlying *Wickham Contracting* notes the GSA's many "change orders." *See Wickham Contracting Co.*, GSBCA No. 8675, 92-3 BCA ¶ 25,040, 124,816–17.

Based on this we conclude that *Wickham Contracting*, contrary to Energy Northwest's contention, was in fact a "Changes" clause case governed by *Bell*. Because the "Changes" clause amounted to a waiver of the

government's immunity against recovery of interest, *Wickham Contracting* cannot stand for the proposition Energy Northwest puts forward (i.e., that interest may be recovered without a waiver if the interest is traceable to the breach).

In the absence of a "Changes" clause (or other waiver of statutory immunity), this court's caselaw makes clear that the government has sovereign immunity against the award of interest. In *J.D. Hedin Construction*, our predecessor court held that a plaintiff could not recover interest payments on loans he had taken out "because of financial stringency resulting from a breach by the Government." 456 F.2d at 1330. More recently, in *Contel Advanced*, this court denied a contractor's attempt to recover certain interest payments it was required to make because of the government's delay. 384 F.3d at 1372.

Energy Northwest argues that these cases should not control this appeal. It attempts to distinguish *Contel Advanced* and *J.D. Hedin Construction* as fundamentally turning on the government's delay in payment. It argues that interest was not recoverable there as compensation for delay, but should be recoverable here as part of the costs of mitigation. Appellee Br. 52–53.

Such a narrow reading of *Contel Advanced* and *J.D. Hedin Construction* is unsupported by the cases. Those cases reason, under *Shaw*, that the government has sovereign immunity against recovery of interest charges a contractor undertakes as part of either financing performance (as in *Contel Advanced*) or staving off creditors (as in *J.D. Hedin*). We find nothing in those opinions, or in *Shaw*, to limit that reasoning to circumstances where the breach involved delayed payment. Further, we see no reason why the fact that

Energy Northwest's interest charges were paid as part of mitigation rather than performance should change our conclusion. The government's sovereign immunity against interest payments, as described in *Shaw*, is not so limited.

We thus conclude that the trial court erred as a matter of law in awarding Energy Northwest its interest costs.

## III

We therefore vacate the Court of Federal Claims' award of damages for the Columbia plant modifications, affirm the award for indirect overhead expenses, reverse the award of interest, and remand for further proceedings.

## COSTS

Each party shall bear its own costs.

**VACATED-IN-PART, AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED**