# United States Court of Appeals for the Federal Circuit

---

**BOSTON EDISON COMPANY,**
*Plaintiff-Appellee,*

**and**

**ENTERGY NUCLEAR GENERATION COMPANY,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2010-5136,-5137

---

Appeals from the United States Court of Federal Claims in consolidated Case Nos. 99-CV-447 and 03-CV-2626, Judge Charles F. Lettow.

---

Decided: September 28, 2011

---

RICHARD J. CONWAY, Dickstein Shapiro, LLP, of Washington, DC, argued for the plaintiff-appellee. With him on the brief were BRADLEY D. WINE, NICHOLAS W. MATTIA, JR. and PABLO A. NICHOLS. Of counsel was ERIN L. WEBB.

MICHAEL B. WALLACE, Wise, Carter, Child & Caraway, P.A., of Jackson, Mississippi, argued for the plaintiff-cross appellant. With him on the brief was LAYTON JAGER SMITH, JR.

ALAN J. LO RE, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for the defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, and JEANNE E. DAVIDSON, Director. Of counsel on the brief were HAROLD D. LESTER, JR., Assistant Director, PATRICK B. BRYAN, JOSEPH D. KELLER, MICHELLE R. MILBERG and SHARI A. ROSE, Trial Attorneys; and JANE K. TAYLOR, Office of General Counsel, United States Department of Energy, of Washington, DC.

---

Before BRYSON, LINN, and O'MALLEY, *Circuit Judges.*

BRYSON, *Circuit Judge.*

This is another in a series of cases dealing with the consequences of the federal government's ongoing breach of its contractual obligation to collect and dispose of the nation's nuclear waste. Our recent precedent dictates the outcome of two of the issues raised in this litigation—the right of a non-breaching party contracting with the government to recover indirect overhead costs associated with mitigation activities, and the right of such a party to recover the costs of financing those activities. We affirm the trial court's judgment on both of those issues. There is one novel question presented by this case: whether the sale of a nuclear plant and the transfer of a decommissioning fund affects the rights of the buyer and seller to recover future damages for the government's partial breach of contract. As to that issue, we reverse the trial court and hold that a sale of assets by a non-breaching

party does not alter the settled common law principle that when the breaching party has not repudiated the contract and is still expected to perform, damages are not recoverable until they are incurred as a result of the breach. In addition, we address issues involving the award of damages in connection with fees paid to the United States Nuclear Regulatory Commission ("NRC"), and we remand for further proceedings on that issue.

I

This litigation concerns the Pilgrim Nuclear Power Station in Plymouth, Massachusetts. In 1983, appellee Boston Edison Company, which owned the Pilgrim plant at the time, entered into a contract ("the Standard Contract") with the United States Department of Energy ("DOE") under which DOE agreed to begin collecting spent nuclear fuel ("SNF") from the Pilgrim plant no later than January 1998. Boston Edison fulfilled its obligation under the Standard Contract to pay fees to the government. The government, on the other hand, has never begun collecting the SNF produced by the Pilgrim plant and thus has been in breach of the contract from January 1998 to the present. The government has breached similar contractual undertakings nationwide, leading to numerous breach of contract actions. The facts surrounding DOE's ongoing breach of the Standard Contract have been related before, and we will not repeat them here. *See, e.g.*, *Neb. Pub. Power Dist. v. United States*, 590 F.3d 1357, 1360-63 (Fed. Cir. 2010) (en banc); *See Me. Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337-39, 1343 (Fed. Cir. 2000).

In 1997, Massachusetts enacted legislation to restructure the electric utility industry in that state. The legislation required regulated utilities such as Boston Edison

either to sell their electricity generation assets and operations or to functionally separate their generation operations from their transmission and distribution operations. *See* Mass. Gen. Laws ch. 164, § 1A (1997). Boston Edison subsequently entered into a settlement agreement with the Massachusetts Attorney General that established a procedure for the company to sell Pilgrim and other power generation assets it held in the state. Under the agreement, Boston Edison had the option to transfer Pilgrim and its operations to an unregulated subsidiary. Boston Edison could also choose to assign responsibility for decommissioning Pilgrim and storing SNF to another party. The agreement allowed Boston Edison to value Pilgrim and the decommissioning and storage responsibilities using a competitive auction.

Boston Edison solicited several potential bidders, including Entergy Nuclear Generation Company. In addition to Pilgrim's physical facilities, Boston Edison offered to transfer a "fully-funded decommissioning fund" to cover the costs of decommissioning Pilgrim and the costs of post-decommissioning storage "until such time as the Department of Energy takes title to the fuel."[1] In other words, Boston Edison offered to make an advance payment to a prospective purchaser to cover the cost of DOE's anticipated future delays in performance of the Standard Contract. Four parties submitted bids, and following negotiations Boston Edison accepted Entergy's bid. Entergy agreed to purchase the Pilgrim plant, inventory, fuel, and land for $80 million and to accept decommissioning and storage responsibilities in return for a decommis-

---

[1]    Pilgrim's initial operating license is due to expire in 2012. Entergy has initiated relicensing proceedings with the NRC that would extend Pilgrim's license through 2032.

sioning fund of $428 million.[2]  In setting the price for the decommissioning fund, Entergy considered the risk inherent in DOE's continued delay in performance under the Standard Contract.  Because of that risk, Entergy agreed to purchase Pilgrim for a price at which Entergy's expected rate of return greatly exceeded its cost of capital.

The Massachusetts Attorney General insisted that Boston Edison retain all claims against the government arising from DOE's expected breach of the Standard Contract,[3] and that any damages awarded be returned to Boston Edison's ratepayers as compensation for SNF-related fees they had paid to the company over a period of several years.  Boston Edison negotiated a clause in the final purchase agreement giving it rights to any claims "related or pertaining to the Department of Energy's defaults under the DOE Standard Contract accrued as of the Closing Date, whether relating to periods prior to or following the Closing Date."  Entergy received rights to all other claims arising from the Standard Contract.  Massachusetts regulators approved the sale of Pilgrim and the transfer of the decommissioning fund after concluding that Boston Edison would "retain[ ] its claim against US-DOE" under that clause.

---

[2]    The initial decommissioning and storage payment was $471 million, but a portion of the payment was ultimately returned to Boston Edison after the Internal Revenue Service determined that the transfer of the decommissioning fund was entitled to favorable tax treatment.

[3]    DOE had announced in 1994 that it would not begin SNF collection before 2010 because the planned national SNF storage repository would not be ready until that time.  Notice of Inquiry, Office of Civilian Radioactive Waste Management: Waste Acceptance Issues, 59 Fed. Reg. 27,007 (May 25, 1994).  Subsequent events have further delayed DOE's performance.

The sale closed in July 1999. One day before the closing, Boston Edison brought suit against the United States in the Court of Federal Claims seeking damages for partial breach of the Standard Contract. In 2003, before the court decided that claim, Entergy filed suit against the United States seeking damages for partial breach of the contract beginning as of the date of the sale. In the Entergy action, the government counterclaimed, contending that any damages awarded to Entergy should be offset by whatever amount was awarded to Boston Edison. After consolidating the two actions, the court in 2008 awarded Boston Edison $40 million in damages. That amount represented the portion of the decommissioning fund corresponding to the projected post-decommissioning SNF-related costs that would be attributable to DOE's breach of the Standard Contract. The court found that it was reasonably foreseeable to the government that Boston Edison would transfer the decommissioning fund to a third party, and that any such transfer would need to account for the risk that DOE would continue to delay performance after Pilgrim was decommissioned. The court therefore determined that DOE had directly caused Boston Edison to pay a larger sum in order to relieve itself of its decommissioning responsibilities. The court denied Boston Edison's claim for damages related to the alleged reduction in the purchase price of Pilgrim due to the government's breach. The court deferred ruling on the government's cross-claim for an offset of Entergy's damages.

In 2010, the court addressed the cross-claims in the Entergy action. By then, Entergy had amended its complaint to request partial breach damages incurred through 2008. The court awarded Entergy $4 million in mitigation damages arising from the government's partial breach of contract. That award included direct and

overhead costs associated with new spent fuel racks that Entergy had installed and fees that Entergy had paid to the NRC. The court denied Entergy's claim for the financing costs associated with mitigation activities. The court also rejected the government's cross-claim for an offset of Entergy's damages against those already awarded to Boston Edison, noting that such an offset would be available only against damages sought by Entergy relating to the period after the Pilgrim plant was decommissioned. The government appeals both decisions.

## II

The government's ongoing breach of the Standard Contract gives rise to damages for partial breach, not total breach. *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005), citing 42 U.S.C. §§ 10131, 10222; *see Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1280 (Fed. Cir. 2008). The parties agree that Boston Edison's claim for damages is premised on a theory of partial breach of contract, but they disagree about the type of damages that are available as a remedy for that breach. The government and Entergy contend that partial breach damages are limited to expenses actually incurred by the time of trial and that they do not include damages that are expected to arise from future delays in DOE's performance. Boston Edison defends the trial court's conclusion that damages for partial breach of a contract may include the diminution in value of assets of the non-breaching party that are sold before the time of trial. Boston Edison argues that the government should have foreseen that, as a consequence of DOE's expected delay in performance, Boston Edison would need to pay Entergy more money to accept decommissioning responsibilities. Although the trial court found that Boston Edison's losses were foreseeable as a result of DOE's delay,

we agree with the government and Entergy that Boston Edison cannot recover damages under a diminution-of-value theory in a partial breach setting.

In ruling that Boston Edison was entitled to damages for diminution in value, the trial court relied on two legal analogies. The court first observed that diminution in value can be used to measure damages in construction contracts if the contractor's performance is defective or incomplete. *See Restatement (Second) of Contracts* § 348(2) (1981). In that situation, the claim is one for total breach, and no further recovery is anticipated. *See id.* § 348(2), illus. 2-4 (referring to completed or repudiated contracts); *see also Farnsworth on Contracts* § 12.13, at 251-52 (3d ed. 2004). The trial court also noted that diminution in value is commonly used in tort law to measure damages for injury to chattel. *See Restatement (Second) of Torts* § 928 (1979). Neither of those analogies applies here, as this is not a case of total breach, nor is it a case of a single, discrete injury, in which the single damages award is the victim's only compensation. In this case, the breach is partial, the injury is ongoing, and DOE remains liable for future damages as they are incurred.

In *Indiana Michigan Power Co. v. United States*, an electric utility brought suit for a partial breach of the Standard Contract seeking, *inter alia*, future damages for the expected construction of a storage facility for housing SNF. 422 F.3d at 1372. In denying recovery of those damages, this court held that "[b]ecause of its highly speculative nature, a claimant may not recover at the time of the first suit for partial breach, prospective damages for anticipated future nonperformance resulting from the same partial breach." *Id.* at 1376. We noted that in the case of a partial breach of contract, the award is limited to damages incurred as of the time of suit, but

that subsequent suits may be brought as further damages are incurred, without offending principles of claim preclusion. *Id.* at 1376-78; *see Restatement (Second) of Judgments* § 26, cmt. g (1982). We extended that rule in *Yankee Atomic Electric Co. v. United States*, where we held that the government could not offset partial breach damages with prospective obligations of the non-breaching party that had not yet matured. 536 F.3d at 1281 ("Just as the utilities cannot now collect damages not yet incurred under the ongoing contract, the Government cannot prematurely claim a payment that has not become due.") (internal citation omitted); *accord Carolina Power & Light Co. v. United States*, 573 F.3d 1271, 1277 (Fed. Cir. 2009).

Boston Edison argues that *Indiana Michigan* does not bar it from recovering damages for diminution of value in this case since it actually suffered losses associated with DOE's breach of contract when it sold Pilgrim before the time of trial. That argument, however, is fundamentally inconsistent with the rule of *Indiana Michigan*. Allowing Boston Edison to recover damages equal to the payment of estimated future breach-related costs to Entergy would undermine the prohibition on recovery of future damages in cases in which DOE has breached the Standard Contract. Owners of nuclear power generation facilities cannot skirt that restriction by paying buyers for the estimated value of damages expected to be caused by DOE's future breach, and then suing the government to recover the prepayment before any such breach-related expenses are incurred. Put another way, the estimated value of future damages agreed upon by two private parties should not set the amount of the government's liability for partial breach. While the figure chosen by Boston Edison and Entergy may turn out to be an accurate estimate of the harm caused by DOE if the agency

continues to delay performance, that figure could also prove to be excessive. The purpose of allowing a series of recoveries for partial breach, as opposed to a single recovery for total breach, is to avoid speculation about the quantum of future damages. *See Restatement (Second) of Contracts* § 243, cmt. e. The actual value of the future damages attributable to DOE's continued partial breach of contract was no less speculative simply because Boston Edison and Entergy attached a price to it.

The trial court rejected the government's argument that DOE's breach of contract did not cause Boston Edison to fully fund Entergy's estimated future breach-related expenses. The court reasoned that the transfer of the decommissioning responsibilities "only affected the timing of the realization of [Pilgrim's] diminished value." That analysis, however, does not account for the significance of timing in the partial breach setting. We made clear in *Indiana Michigan* that "prospective damages for anticipated future nonperformance" are not recoverable in a partial breach case. 422 F.3d at 1376. Such damages are recoverable only in subsequent actions commenced after the government's continued breach of contract results in further damages. We therefore reverse the court's award of damages to Boston Edison. In light of our decision on that issue, we deny the government's cross-claim for an offset against the damages award to Entergy as moot.[4]

---

[4]    We do not decide the respective rights of Boston Edison and Entergy relating to any partial or total breach of contract by DOE that postdates the decommissioning of the Pilgrim facility. The trial court did not address that aspect of the parties' rights and obligations under the contract between them, and we decline to do so in the first instance. We also do not address the government's argument that Boston Edison's transfer of expected post-

### III

The government also appeals from the trial court's award of damages based on Entergy's payment of NRC fees. The NRC imposes fees on nuclear energy facilities to recover its budgetary expenses. Some of the NRC's costs relate to facility-specific activities; the Commission recovers those costs through fees imposed on individual facilities. *See* 10 C.F.R. pt. 170. The Commission also incurs general expenses; it recovers those costs through fees assessed uniformly across different classes of licensed nuclear facilities. *See* 10 C.F.R. pt. 171. The damages awarded by the trial court relate to the Commission's generic fees.

As of 1998, the Commission assessed an annual fee against all operating nuclear generating facilities, including Pilgrim. 10 C.F.R. § 171.15(b) (1999). Among other things, that fee covered the NRC's general expenses related to nuclear plant decommissioning and wet storage of SNF. At the same time, the Commission imposed a separate annual fee on dry storage facilities. *Id.* § 171.16. Boston Edison had not constructed a dry storage facility to store fuel from Pilgrim, so it did not pay the dry storage fee.

Beginning in 1999, the NRC changed its fee structure. The revised regulations eliminated the dry storage fee and created a new Spent Fuel Storage/Reactor Decommissioning ("SFS/RD") fee. The Commission used the SFS/RD fee to recover its general expenses related to wet storage, dry storage, and decommissioning activities. *See* Revision of Fee Schedules; 100% Fee Recovery, FY1999,

decommissioning SNF expenses relieves DOE of its obligation to pay those expenses once incurred.

64 Fed. Reg. 31,448 (June 10, 1999). As a result of the rule change, operating nuclear generation facilities such as Pilgrim began paying both an operating facility fee and the SFS/RD fee. 10 C.F.R. § 171.15(b)-(d) (2000). Dry storage facilities and non-operating facilities with SNF stored onsite paid only the SFS/RD fee. *Id.* § 171.15(c)(1). The Commission's revised fee structure remained essentially unchanged between 1999 and 2008.

The trial court determined that the NRC changed its rules in 1999 as a consequence of DOE's breach of the Standard Contract. The court also determined that Entergy was forced to pay more in aggregate fees as a result of the rule change, for two reasons. First, through the SFS/RD fee, Entergy became responsible for sharing the cost of the Commission's dry storage activities, even though it did not operate a dry storage facility. Second, the NRC's expenses relating to wet storage had changed as a result of DOE's breach, and Entergy's SFS/RD fee payments helped the Commission recover those wet storage expenses. Accordingly, the trial court awarded Entergy damages equal to the amount of the SFS/RD fees it paid between 1999 and 2008, less the portion of those fees attributable to decommissioning activities.

At trial, the government argued that Entergy should not recover any damages for fees associated with wet storage, because Entergy would have paid fees for the Commission's wet storage activities even under the pre-1999 rules. However, the government does not renew that argument in this court. On appeal, the government's only specific quarrel with the damages award is that after the change in the NRC's fee structure, the Commission's costs associated with wet storage and decommissioning were spread among a larger number of entities. Before the rule change, only operating facilities had paid fees

associated with those costs; after the rule change, however, dry storage facilities and non-operating nuclear facilities that stored SNF had to pay those fees as well. The government argues that the damages award must be adjusted to reflect any decrease in Entergy's wet storage and decommissioning fees due to the fact that more entities were helping to pay the NRC's wet storage and decommissioning costs. In support of its argument, the government points out that Entergy's overall fees decreased following the NRC's rule change.

The trial court refused to adjust Entergy's damages award to account for the larger number of fee-paying entities. The court determined that any correlation between the decrease in Entergy's overall fees and the larger number of fee-paying entities was too attenuated to justify an adjustment of the damages award. The court explained that "[w]hile the pool of licensees to support spent fuel storage costs may have increased as a result of the rule change, those licensees brought with them added costs to the NRC, costs attributable to DOE's breach." In other words, the court reasoned that DOE's breach had increased the aggregate expenses of the NRC, and the Commission had passed those costs onto operating nuclear facilities such as Pilgrim in the form of increased SFS/RD fees.[5] The court concluded that Entergy's re-

---

[5] The trial court also highlighted the fact that the NRC reduced the percentage of its overall expenses that was recovered by fees beginning in fiscal year 2001. *See* 42 U.S.C. § 2214(c)(2)(B). However, that "fee relief" is not relevant to Entergy's damages award because it affected only the "surcharges" paid by operating facilities. *See, e.g.*, Revision of Fee Schedules; Fee Recovery for FY2001, 66 Fed. Reg. 32,452, 32,463-64 (June 14, 2001). The trial court did not award Entergy any damages associated with surcharges.

quested damages were a "reasonable approximation" of the increased fees it incurred as a result of DOE's breach of the Standard Contract.

Record testimony supports the trial court's finding that the NRC's wet storage costs increased as a result of DOE's breach of the Standard Contract. However, the trial court awarded Entergy damages corresponding to the entire portion of the SFS/RD fee attributable to wet storage, so any increase in wet storage costs was already incorporated into the damages award. It was therefore not proper for the court to treat an increase in Entergy's wet storage fees caused by the NRC's increased costs as a setoff against the reduction in wet storage and decommissioning fees caused by the increase in the number of fee-paying entities. The same would be true of any increase in the portion of the SFS/RD fee attributable to dry storage, because Entergy was awarded damages corresponding to all fees that it paid relating to dry storage as well.

In *Southern Nuclear Operating Co. v. United States*, 637 F.3d 1298, 1304 (Fed. Cir. 2011), we explained that a non-breaching plaintiff bears the burden of persuasion to establish both the costs that it incurred and the costs that it avoided as a result of a breach of contract. The breaching party may be responsible for affirmatively pointing out costs that were avoided, but once such costs have been identified, the plaintiff must incorporate them into a plausible model of the damages that it would have incurred absent the breach. *Id.*; *see also Energy Nw. v. United States*, 641 F.3d 1300, 1307-08 & n.5 (Fed. Cir. 2011). In this case, the government has identified avoided costs in the form of a reduction in the share of wet storage and decommissioning fees paid by Entergy. Under our precedent, Entergy is responsible for incorporating those cost savings into its damages calculation.

While damages need not be proved with absolute precision, *see San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997), we have insisted in prior cases that the plaintiff's model of damages incorporate reasonable assumptions about the costs that it would have incurred absent breach of contract, *see, e.g., Energy Nw.*, 641 F.3d at 1307-08. If such a model cannot be produced without assistance from the breaching party, and the breaching party fails to aid the plaintiff in constructing a model of the non-breach world, the trial court may be justified in drawing factual inferences regarding that issue in favor of the plaintiff. *Id.*

We remand for the trial court to determine whether adjustments should be made to Entergy's damages award to account for the decreased share of generic wet storage and decommissioning fees paid by Entergy as a consequence of the NRC's rule change. On remand, Entergy will be responsible for quantifying and incorporating all effects of the change in the Commission's fee structure into its damages model.[6]

IV

The trial court awarded Entergy overhead costs associated with the procurement of materials and capital

---

[6] The government makes a general argument that Entergy failed to meet its burden of proof to show the amount of the NRC fees that it would have paid absent DOE's breach of the Standard Contract. That argument carries no weight absent specific allegations of damages wrongfully awarded to Entergy. The government bears responsibility for identifying particular problems with Entergy's calculation. *See S. Nuclear Operating Co.*, 637 F.3d at 1304. On remand, the government may not challenge aspects of Entergy's damages calculation that it has not contested on appeal.

expenditures made in connection with Entergy's mitigation efforts in response to the government's breach. The court found that Entergy's method of assigning overhead costs to those projects complied with Generally Accepted Accounting Principles ("GAAP") and Federal Energy Regulatory Commission regulations. Based on record evidence, the court concluded that the overhead costs were actually incurred and "were explicitly tied to activity involving the re-racking projects."

The government argues that in order to recover damages for indirect overhead costs, Entergy must prove that additional costs were incurred as a result of DOE's breach. We rejected that argument in our recent decision in *Energy Northwest v. United States*, 641 F.3d 1300 (Fed. Cir. 2011). In that case, as here, the electric utility sought to recover the portion of overhead costs (calculated using GAAP) that was attributable to mitigation projects. We held that "[o]nce a plaintiff has proved that certain work was undertaken because of the breach . . . he is entitled to prove the amount of the associated cost (including both direct and indirect costs) by whatever reasonable techniques are available." 641 F.3d at 1309. The government has not shown clear error in the trial court's finding that Entergy's overhead costs were directly attributable to mitigation projects, and we therefore uphold the award of those costs to Entergy. *See S. Cal. Edison v. United States*, No. 2010-5147 (Fed. Cir. Aug. 23, 2011), slip op. at 6-7; *Dairyland Power Coop. v. United States*, 645 F.3d 1363, 1373-74 (Fed. Cir. 2011); *Energy Nw.*, 641 F.3d at 1309-10; *Carolina Power & Light*, 573 F.3d at 1277.

V

Entergy seeks to recoup the cost of securing capital for mitigation projects undertaken as a result of DOE's breach. The trial court held that Entergy's recovery of the cost of capital is barred by 28 U.S.C. § 2516(a), which provides that "[i]nterest on a claim against the United States shall be allowed . . . only under a contract or Act of Congress expressly providing for payment thereof." In its briefing before this court, Entergy argued that it sought interest *as* a claim as opposed to interest *on* a claim. *See Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994). Entergy also argues that parties contracting with the government have recovered financing costs in other cases. *See, e.g.*, *Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).

Our recent opinion in *Energy Northwest* rejected arguments identical to Entergy's and held that private parties to the Standard Contract may not recover the costs of financing mitigation projects. 641 F.3d at 1310-13 (discussing "interest as a claim" argument); *id.* at 1311 n.6 (discussing prior cases). At oral argument, Entergy withdrew those arguments in light of our decision in *Energy Northwest*. Nevertheless, Entergy continues to argue that it is entitled to recover the cost of securing capital because DOE has "assumed the status of a private commercial enterprise." *Library of Congress v. Shaw*, 478 U.S. 310, 317 n.5 (1986). Entergy contends that Congress waived the no-interest rule in the Nuclear Waste Policy Act ("NWPA") by compelling the government to enter into the business of collecting and disposing of nuclear waste materials.

Entergy cites the Supreme Court's decision in *Standard Oil Co. v. United States*, 267 U.S. 76 (1925), in support of its argument. In *Standard Oil*, the federal Bureau of War Risk Insurance issued a standard com-

mercial insurance policy to a shipper to insure against the risks of war. After holding the government responsible under the policy for the loss of a steamship, the Court awarded prejudgment interest to the shipper. The Court reasoned that "[w]hen the United States went into the insurance business, issued policies in familiar form and provided that in case of disagreement it might be sued, it must be assumed to have accepted the ordinary incidents of suits in such business." 267 U.S. at 79.

The Supreme Court clarified the scope of the commercial enterprise exception to the no-interest rule in *United States v. Worley*, 281 U.S. 339 (1930). *Worley* concerned a veteran who held an insurance policy from the government payable upon death or total and permanent disability. The Court held that the veteran's widow could not recover interest on insurance payments that had been wrongfully withheld, stating that "[t]here is nothing in the conduct of the United States in respect of life and disability insurance from which an agreement on its part to pay interest may be implied." 281 U.S. at 344. The Court distinguished *Standard Oil* as a case that turned on the government's contractual promise to pay the shipper's losses within a specified period of time. *Id.* at 342. The Court also noted that, in *Standard Oil*, the government had profited significantly from its shipping insurance contracts, not unlike a private commercial enterprise, whereas it did not profit from the veterans' insurance program. *Id.*

The commercial enterprise exception does not apply in the present case. The NWPA was designed to solve the national problem of permanent disposal of spent nuclear materials. *See Neb. Pub. Power Dist.*, 590 F.3d at 1360. The Standard Contract effectuated the intent of Congress to assign responsibility for nuclear waste disposal to the

federal government "in order to protect the public health and safety and the environment," and to ensure that the private generators and owners of the waste material bore the cost of its disposal. 42 U.S.C. § 10131(a)(4); *see* 10 C.F.R. § 961.11 (Standard Contract, preamble). Thus, the government's purpose in entering into the Standard Contract was not to turn a profit but to achieve public objectives. *See Sandia Oil Co. v. Becton*, 889 F.2d 258, 263 (10th Cir. 1989) (commercial enterprise exception limited to a "business-type activity with a business-minded purpose"). Entergy has not pointed to any provision of the Standard Contract or the NWPA that would indicate Congress's intent to waive the no-interest rule. Consistently with our decision in *Energy Northwest*, we conclude that Entergy may not recover the cost of securing capital to fund its mitigation efforts.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**